Ruffin, C. J.
The counsel for the prisoner assigned as an error in the judgment, that it does not appear by the record, that the prisoner was personally present in Court, at the time of the trial and sentence passed. The record sets forth the indictment found at February term 1845 ; and then “ the prisoner, John P. Craton, appearing at the bar and pleads not guilty and he is thereupon committed to close custody. At August term following, the record states, that “ it is ordered by the Court, that the prisoner, John P. Craton, be brought to the bar,” and immediately thereafter, it states that the jury were sworn and-empannelled, and that they “ find the prisoner at the bar guilty,” &c. and, thereupon, the judgment of the Court, “ that the prisoner, John P. Craton, be taken back to the prison, &c. from which judgment the prisoner prays an appeal .and gives bond, &c.”
It is admitted, that it is t]j.e privilege of the accused-to confront his.accusers, and be present in his proper person *169 to make defence, by pleading and before the jury, and also to make objection to sentence being- passed. But, we think it sufficiently appears, that this person was present in all those stages of the case. We agree, that it would be much better to state it directly. It is a very simple thing to write down what is done in Court in the present tense, as the acts occur, and, one would think, it would be easier to adhere to settled forms, than to rely upon very variety of mode of framing- entries being sufficient. It is greatly to be regretted, that the Clerks will not be guided by precedents in such- matters ; and that quoted at the bar from Blackstone, 4 Com. Appendix 1, is well framed. But although it is the more correct, J;hat the presence of the accused should be expressly affirmed, yet we conceive that it is sufficient, if it appear by a necessary or reasonable implication. Here, John P. Craton, who had been before committed tg the custody of the Sheriff, was ordered to be brought to the bar, and immediately thereafter, he is called, by the jury in giving, and by the Clerk in recording, the verdict, the prisoner at the bar, and next, the Court, in passing sentence, adjudged that the prisoner, John P. Craton, be taken back to the prison. It seems to us, that there can be but one intendment as to the facts, whether the prisoner was present or absent upon the several occasions of the trial and judgment.
The prisoner’s counsel next objected to the instructions given by the presiding Judge to the jury. It was insisted, that his Honor erred in the manner in which he left it to the jury to find, whether the killing was murder or manslaughter; and also in holding, that there was no legal provocation to the prisoner to mitigate the offence to manslaughter.
As every intentional killing- is murder, unless justified, excused, or palliated by a provocation, the natural order of investigation is by considering, first, whether there was here a legal provocation. Upon that point the facts seem *170 not to have been disputed, and appear to be as follows: The deceased and the prisoner lived in the same neighborhood, and the latter had for some time indulged an illicit affection for the former’s wife ; as avowed to the witness Archibald, to whom the prisoner said, he could elope with her. On the night before the catastrophe in this case, Harrison saw the prisoner lying on a bed with his wife, and in her embraces. He remonstrated against the familiarity ; but the woman persisted and-the prisoner also continued his position. The next evening, when the parties were about leaving the Court-house, Harrison’s wife told him, in the presence of the prisoner, that she would ride home behind Craton. The deceased objected, and told her that she could ride in a wagon with her mother, and, upon her refusing that, he proposed that she should ride behind on his horse. She refused that also, and then he offered ,to walk and let her have Ms horse ; but she still replied, that she would not. After-wards, Harrison’s wife again came to him in company with Craton and with her brother’s wife, Mrs. Garman, and said to him — “ It is time to start: Mrs. Garman will ride behind Hartswell Jones, and I will ride behind Cra-ton and Harrison -replied — “ You can go on, and I will overtake you.” She then got up behind the prisoner and they went off; and soon afterwards Harrison himself followed. It does not distinctly appear how far he went, before he overtook the other two. But when he did over- . take them, he did not find them with Mrs. Garman and Jones, but by themselves. The three continued"' on the road in company some distance, and when they were first seen, (by the witness, Murphy,) the prisoner and the deceased were in a high quarrel, and upon an enquiry by the witness, what was the matter, Harrison said — “ She as my wife, and he keeps her: I’ll kill him and he then drew his knife. The prisoner and the woman still went on, she saying, “ this (the Camden road) is my road.” After some dissuasion from the witness, the deceased again *171 swore lie would kill the prisoner, and followed on. They were afterwards overtaken on the road, about four miles from the Court-house, by the witness, Wilson Biggers, when the three were together and by themselves. Harrison repeatedly demanded of the prisoner to give up his wife, and forbad him from getting on his horse, with her behind him. The wife said, her husband was too drunlc and his horse too small for her to ride with him, and refused to get down; and Harrison repeatedly declared he would kill the prisoner, or lose the last drop of his own blood, before his wife should ride further with Craton. Neither party then made an assault on the other. But at the instance of a neighbor, Bost, who was passing by, Harrison went on, and the prisoner remained behind with his wife. The two then'proceeded slowly on the road, and after they had gone some distance, how far does not certainly appear, Harrison was seen returning, and he came up, meeting them. With his knife in his hand, he turned his horse immediately across the road, before Craton’s horse, and said “ You must give up my wife.” The prisoner said “ I don’t want to hurt you,” and he turned his horse, and was going back towards the Court-house, when Harrison rode past him, and again turned his horse across the road in front of Craton, and, having his drawn knife still in his hand, he repeated, “ Yon must give up my wife, or I will kill you.” The prisoner then said, “ I will leave you,” and turned his horse out of the road, and went into a field about ten steps, when Harrison turned his horse before him again. Thereupon, the prisoner got down from his horse, and said to Harrison, “ If you don’t leave me, I’ll give you a beating,” and then pulled off his hat and coat, broke off a dead old field pine,, and went up to Harrison, as he sat on his horse, and gave him a blow with the billet, which fractured his skull and killed him. At the time the blow was given, Harrison held the bridle with one hand, and had his knife in the other — as the witness, W. *172 Biggers swore, resting on or near the pommel of bis saddle, with the blade appearing between the thumb and fore-finger ; or, as a witness said, Biggers had stated before the Coroner, with the blade coming out at the little linger, and the arm somewhat elevated.
Upon those facts the Court held, that no legal provocation appeared for the killing, which, for the purpose of this question, is to be considered as having been intended. It is not denied by the counsel for the prisoner, that the question of provocation is proper for the decision of the Court; for, undoubtedly, whether certain facts amount to a sufficient provocation to palliate a killing from piurder to manslaughter, is entirely a question of law; as the enquiry is not, whether the passion of the prisoner, in particular, was actually inflamed, but whether in those circumstances a man ought, and men in general would, because of the infirmily of our nature, be moved beyond the government of reason so far as to have designedly killed the person who gave the offence. It is said, however, that there was here a provocation, constituted by the deceased’s stopping the prisoner repeatedly on the highway, which amounted to an assault, or, at the least, to a false imprisonment. The Court agrees, that if Harrison either assaulted or imprisoned Craton uni awfully, it would amount to a legal provocation. The question is, whether that was the case. There was no actual assault in this case. There was no attempt to strike. There was a mere threat, that the deceased would kill the prisoner, if he did not give up the other’s wife, and, accompanying the threat, the prisoner drew his knife. But he made no attempt to use it; unless it be, that he raised his hand with the knife drawn, as the prisoner approached him. But if he did so, that would not be ,an unlawful assault; for, as. the prisoner got from his horse, stripped himself and declared that he would beat the deceased, if he did not leave him in possession of his wife, and then went at the deceased for the purpose of beating 'him, with an in *173 strument, apparenly from its size, sufficient to give a heavy blow, and with the instrument raised, and the deceased still sat on his horse and did not move from his place, an attempt, if made by the deceased to strike under those circumstances, and supposing the deceased was not wrong in stopping the prisoner from carrying away his wife, would have been justifiable in self-defence. The prisoner was in the act of making the first assault, and that, probably, of a grievous kind, and the deceased would have had a rigid to prevent him if he could. But it cannot be denied, that the deceased stopped the prisoner several times on the road, and that he was preventing his going on, at the time the prisoner got from his horse and gave the fatal blow,; and, if that was an unlawful restraint, that would extenuate the killing to manslaughter. Mr. East, as quoted by the counsel, lays down the rule, that “ if a man he injuriously restrained of his liberty, and he, at the time, kill the person, who does it, hft is but guilty of manslaughter — that is, when the killing is not effected by any great cruelty or barbarity.” And he gives, as examples, of the rule the cases of Buckner, and of Withers; in the former of which, a creditor went into his debtor’s chamber, having put a man at the door with a sword, to prevent the debtor from escaping, while he sent for a bailiff to arrest him. and the debtor killed the creditor, while talkiug with him in the chamber; and, in the latter, a serjeant put a common soldier under arrest, who thereupon killed the serjeant with a sword, and on the trial it was not shewn by the articles of war, or by the usage of the army, that the serjeant had authority to arrest; in .those cases it was held, that the killing was extenuated. 1 East. P. 0. 233. But it is manifest, that the ground for so holding was, that the restraint on the liberty of those two persons was “injurious,” as Mr. East calls it; or, as Mr. Russell says, in speaking of the same cases, the men “ had been injuriously and without proper authority restrained of their liberty.” 1 Russ. Or. L. 487. *174 In those cases there was no colour of right for the imprisonment, either of the debtor or soldier; for a creditor cannot, himself, detain his debtor, but only through an officer with process ; and the Serjeant’s authority was not proved. But if a person be lawfully arrested by a precept aud kill the officer, it is clearly murder. And where there is not such a plain and direct authority to arrest, and an arrest made under it, but only a restraint upon one man by another, so far as to prevent the former from doing what the latter may lawfully resist his doing, the reason is the same ; and if the person, restrained in that manner and for that cause, kill the other, it is murder.. Thus Russéll says, “such personal restraint and coercion, as one man may lawfully use towards another, ■will not form any ground of extenuation.” 1 Russ. Cr. L. 437. For this position he cites Willoughby’s case, in which a landlord had refused to admit two soldiers into his house to get beer at a late hour of the night, and, afterwards, when the door was opened to let out some company, one of the soldiers rushed in and demanded beer, the other remaining without: the landlord still refused to furnish the beer, and the other refused to depart, and demanded it, and offered to lay hold of the landlord, and the latter at the same instant collared him; the one pushing and the other pulling each other towards the door; and there the landlord received a violent blow from a sharp instrument, from the other soldier, which caused his death : and it was held to be murder in both soldiers, notwithstanding the struggle between the landlord and one of them ; “ for the landlord did no more in attempting to put the soldier out of his house, at that time of night, and after the warning he had given him, than he lawfully might; which was no provocation for the cruel revenge taken.” The question, then, in this case, turns upon the right of the deceased to coerce the prisoner to surrender to him his wife, and that depends • much on the authority of a husband over his wife. *175 There is no suspicion, that the prisoner detained the wife against her will. If that had been the case, the husband could have justified a battery in her defence and for her rescue. But, though she was detained by the prisoner with her consent, thé Court is of opinion, that under the circumstances the deceased had a right, after demanding his wife, to stop the prisoner, as he did, until he should give her up. In general, a man has a right to the exclusive custody of his wife. It may be true, that any person has a right to protect her from the violence of her husband, 'and take her from cruel usage under his hand. And it may also be true, that the husband would not have a right to take her by force from the house of a parent or any proper protection, during a difference between them, nor, indeed, to confine her, where there is not plainly a sufficient reason for imposing the restraint upon her. But, in Lister’s case, 8 Mod. 22, 1 Str. 478, it was agreed by all the Court, that where a wife makes an undue use of her liberty, as by going into lewd company, it is lawful for the husband, in order to preserve his honor, to lay his wife under a restraint; though when nothing of that appears, he cannot justify the depriving her of her liberty. Now, that is a full authority, and founded, as we think, upon the very best reason, that Harrison might have restrained his wife by force from criminal conversation with the prisoner; and, by consequence, that he might compel her to leave the society of the prisoner ; if he had any reasonable grounds to suspect, that those persons had perpetrated, or that they were forming the guilty purpose of perpetrating, a violation of his rights and honor, or were contracting those regards towards each other, which would probably result in that stigma. That such was the state of fhe case between these parties, there is very strong ground to affirm. The avowal by the prisoner of an affection for this woman — the inference that she returned it, to be deduced from numerous circumstances, as that he said that he could elope and *176 leave the country with her; and the familiarity with which she laid on the same bed with the prisoner, with her arm around his neck, and they both refused to change their situation, though the husband remonstrate d ; her pertinaciously insisting to ride home behind the prisoner, and refusing to go in any other manner ; her being found by the husband on the road with the prisoner alone, and not also in the company of Mrs. Garman, her sister-in-law ; and the oft-repeated refusals of both the wdfe and the prisoner to let tire husband take her, after he overtook them, and after he had explicitly stated, as proved by tire prisoner’s witness, Murphy, that the reason why he insisted on having her was, that the prisoner kept her: these circumstances leave no room to doubt, that the husband' entertained the belief, and that upon strong-grounds of presumption, that it was essential to his wife’s purity and his honor, that he should separate her from the company of the prisoner. Such a cause would justify the husband in effecting that end by compulsion on his wife, for it was obvious that nothing short of it would be effectual. And it would seem necessarily to follow, that he might use actual force towards the paramour also, in order to regain his wife from him. But we need not consider that, as we have already seen, that there was no actual assault by the deceased. There was merely a stopping of the prisoner by the deceased — drawing up his horse in front of the prisoner several times, accompanied by a demand of his wife, and a declaration that the prisoner should not go on, unless he gave up the wife. Those acts, we think, were not an injurious restraint on the prisoner’s liberty, but only a lawful impediment to his carrying away the deceased’s wife, to her ruin and the husband’s dishonour. There was, consequently, no provocation to extenuate the killing of Harrison.
After the foregoing observations, we need not notice particularly the suggestion, that Harrison’s consent at the *177 Court-house, that his wife might ride behind the .prisoner, might make a difference. For there is nothing to raise a suspicion of connivance, on the part of the husband, at his wife’s forming an improper connexion with the prisoner ; as it is obvious that he was stung at the suspicion of it, and that he did every thing that he could deeentty do in public, to prevent her from going with the prisoner, and he did not, at last, consent, until he had reason to believe they were to go in company with other persons, and, particularly, with her sister-in-law. Besides, there was much in the conduct of the parties after he gave his consent, to induce him to retract it; as their travelling alpne, and their peremptory refusal to be separated, even by the deceased’s threat to take the pi-isoner’s life, if he did not give her up.
We are next to enquire, whether the killing, thus appearing to- be without provocation, was murder or not. As to this point, the facts, in addition to those stated in reference to the former point, are these. The stroke was given with a pine stub, which had- been killed by cutting off the top, and was rotten at the ground, was about three feet in length and about three inches in diameter, with the bark on, and had absorbed so much water from a rain, that had just fallen,* that it would not burn by having a pine torch put to it. With that weapon, the prisoner, standing up hill, above the deceased, gave the latter a blow with both his hands, which fractured the skull six inches across the direction of the blow, and also broke the billet itself square off into two pieces. Such is the description of the instrument and the act, given by the only witness who was present at the homicide ; and he says, that when he went away, he left the prisoner with the body, and also that the torch which was then burning, was setting on one of the pieces of the stick. No other witness saw it; bu't John W.. Biggers states, that next morning the prisoner came to his house, and after en-quiring of him whether his son, Wilson Biggers, had not *178 told him what had happened, and learning that he had not, the prisoner said : “ 1 fear I struck him harder than I intended: I thought it was a rotten old field pine, eaten by bugs and worms, and gave him a two-handed lick.” The witness then went with the prisoner to the place, and found the man dead, and saw his hat and knife lying by him, but did not see either piece of the stick; and another witness says, it could not be found. The prisoner was a much larger and stronger man than the deceased.
Upon this evidence, supposing the witnesses to be believed as to the fact and the manner of killing, theopinion of the Court is very clear, that it was, in law, murder. In the beginning of his treatise on homicide, Judge Foster lays down the true rule upon this subject in few words, but very elear. “ In every charge of murder,” says he, “ the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity are to be satisfactorily proved by the prisoner, unless theij arise out of the evidence produced against him; for the law presumeth the fact to have been founded in malice, until the contrary appeareth.” In the next section he adds: “ In every case where the point turneth upon the question, whether the homicide was committed wilfully and maliciously, or under circumstances justifying, excusing, or alleviating, the matter of fact, viz. whether the facts alleged by way of justification, excuse, or alleviation are true, is the proper and only province of the jury. But whether, upon a supposition of the truth of the facts, such homicide be justified, excused, or alleviated, must be submitted to the judgment of the Court; for the construction the law putteth upon facts, stated and agreed or found by a jury, is in this, as in all other cases, undoubtedly the proper province of the Court.” He afterwards says, that neither words of reproach, nor indecent and provoking actions and gestures, without an assault upon the person, are a sufficient provocation to free the party *179 killing from murder. “ Tliis rule,” he says, “ governs every case, wlxere the party killing upon such provocation naaketh use of a deadly weapon, or otherwise manifest an intention to kill or to do groat bodily harm; hut if he had given the other a box on the ear, or had .struck him with a stick or other weapon not likely to kill, and had unluckily and against his intention killed, it had been manslaughter.” From these positions it appears clearly, that the law presumes every wilful killing, murder, until it appear, either upon evidence by the accused or upon the evidence produced against him, that he did not intend to kill or to do any great bodily harm. And it farther appears, that unless the stroke, which produced the death, be shewn to have been one, from-which death was not likely to ensue, as a box of the ear or with a weapon not likely to do greatly bodily harm, the law adjudges, that the presumption of malice, which consists of a wicked, vindictive disposition, is not repelled. Of course, the implication, that there is or is not malice, from the nature of the instrument and the mode of using it, being made by the law, it is the proper province of the Court to declare it. Noav, with these principles in our minds, it seems that this killing can he no less than murder. It does not appear, that the prisoner killed unluckily against his intention. It may be true, that he did not. design actually to take the other’s life. We cannot tell. But what we mean is, that the instrument used does not appear to have been such, that it was not likely to have done great bodily harm, when wielded by the prisoner, a very strongman, and having the advantage of giving a fair blow from a position above the deceased. On the contrary, from the description of the instrument and from the effect it had, the presumption •prima fa.cie is, that it was calculated to do a grievous injury. It was three feet long and three inches through, and heavy from moisture absorbed, and was so sound as to break into only two pieces, by a blow, which fractured the skull of a man, thirty years *180 old, for six inches, it therefore cannot be viewed in the light of the “ small cudgel,” with which Rowley struck the boy, who had beaten his son: from which circumstance, it was properly held that he was guilty of manslaughter only. Fost. 294. It is true, the prisoner said next morning, “ that he thought it was a rotten old field pine, eaten by bugs and worms,” and he gave that as an excuse for having struck, with all the force he was master of, with both hands. But that is not sufficient. The prisoner ought to have shewn the fact to be, as he said he thought it was, namely, that the stick was not likely to produce great barm, but was worm-eaten and light. Now, it is remarkable in this case, that the prisoner did not produce the weapon in Court, so that the Coart and jury might judge of the danger of a stroke with it, nor could it be found next morning on the ground. One witness left it there with the prisoner the night of the homicide, and the next person, who was there'the next morning, did not see it, nor could it be found, though searched for around the place. How, then, could the prisoner ask the benefit of the law, inferring innocence of an intention to do the person killed great harm, upon the ground that the instrument was not likely to do such harm, when, in point of fact, it did it, and when he would not produce it, but appears to have been particularly anxious that it should not be judged of either by inspection, or by its size, weight, and actual strength, but by liis declarations of what he thought it was, when he was about to strike, and not what he found it to be after it had done the mischief. The 'defence therefore fails in point of law. The legal presumption exists in full force, that the prisoner intended to do great harm to the deceased by striking with an instrument, that did produce death ; it not appearing, that the weapon was of that size, strength, and weight, which is not likely to produce death ; but, it appearing from those circumstances, prima facie, to the contrary, and that presumption being greatly *181 fortified by the circumstance, that the prisoner destroyed .the weapon to prevent it from being brought up in evidence against him. It seems to the Court, therefore, that his Honor should properly have stated to the jury, that the prisoner was guilty of murder, simply upon the ground, that the presumption of malice was not repelled by any thing, which shewed that the weapon was not a dangerous one. It clearly was ; and, therefore, like the case stated in the books, where a person, upon slight provocation, knocked out another’s brains with a hedge-stake, this was, in law, murder. His Honor, however, did not think proper to assume so much; but he left it to the jury to say, whether the weapon was a deadly one, and told them, as they should infer from that circumstance, that the prisoner did or did not intend to kill, they should find him guilty of murder or manslaughter. Of this instruction the prisoner, we think, has no cause to complain. If it appeared from the instrument that it was not a deadly one, as a riding-switch for example,' a convicted prisoner would have just cause to complaim, that the Court had left to the jury to say, whether that was such an instrument as the law calls deadly. So, when the instrument appears, prima facie, capable of taking life or grievously hurting, in like manner it seems to be proper, the Court should say, that such an instrument is called in law a deadly weapon. But whether the Court was right or wrong in this case, in leaving to the jury to say whether this was a deadly weapon, there cannot be any prejudice to the prisoner, unless it appear to this Court, that upon the evidence, it was not an instrument of that character; for, Ity the verdict, we must see that the jury found it to be a deadly weapon,' and, therefore, in so doing they only found according to the law. Being established to be a deadly weapon, either because it is to be so held in law, or because it has been found by the jury to be so in fact, the legal consequence follows, that •an intention to kill is established, and that, being without *182 provocation, constitutes the killing, murder. Thus we understand the views delivered by the Judge to the jury in this case. ,
After some preliminary observations respecting the different kinds of homicide, which have nothing to do with the case here, nor, indeed, before the jury, the Judge stated, that the enquiry was narrowed down to the point, whether the killing was murder with malice implied, or manslaughter. And he then said, that depended on the question, whether the prisoner, when he gave the blow, intended to kill or do great bodily harm ; and he stated, that if the prisoner intended to do great bodily harm, though the effect exceeded his actual intention, he was liable for the consequences. As to the prisoner’s intention, he stated, that it had been properly insisted for the State, that a man is presumed to intend to do what he does, and that he also intends the natural con sequences of his act; and, therefore, that if the prisoner killed Harrison, it is to be presumed that he intended to kill him, unless, from the circumstances, the jury be satisfied that such was not his intention. It was said for the prisoner, that there is error in that instruction, because it lays down the rule as an isolated proposition, that every killing without provocation is presumptively murder, without the established qualification, that if it be with an instrument not likely to produce death, it is only manslaughter. If that construction of the charge were true, we do not .see that it would be an error, of which the prisoner can complain ; for the proposition, as laid down, is the general rule of the law, and the qualification is only the exception. Therefore, the prisoner, as the ground of his exception to the instruction, must make out that the facts bring him within the exception and qualification to the rule, Avhich the Judge omitted to lay before the jury; and here, as has been already said, it cannot be seen, that the instrument was not a deadly one, and therefore the prisoner could crave no benefit of the qualification *183 now insisted on. But, in reality, his Honor did explain that point to the jury, and gave the prisoner all the advantage of it that he could possibly be entitled to. For, in the first place, we must understand, that, when the Judge spoke of a killing in that part of his charge, he did not mean every killing, but the killing in the manner proved in that case ; and he states, that it was to be presumed that he intended to kill, unless, from the circumstances, the jury were satisfied that such was not his intention. The truth is, that the law implies the, intention from the circumstances, and it is not for the jury ; and thus far the error was on the side of the prisoner, unless the circumstances shew here, that in law it was not murder. But letting that pass for the present, it is clear that his Honor stated to the jury, that if they were satisfied from the circumstances, that it was not the prisoner’s in-, tention to kill, they should acquit him. Then, it is stated that it was farther insisted for the State, that, upon this evidence, the stick used was a deadly tveapon, and consequently, that it was murder, there being no legal provocation ; and his Honor was so requested to charge the jury: While, on the other hand, the counsel for the prisoner urged that he did not intend to do great bodily harm, inasmuch as, among other reasons, the prisoner alleged his mistake as to the danger of the weapon, and it had broken off so easily at the ground: And thereupon the Court, leaving the consideration of all those arguments to the jury, refused to give the instruction prayed for by the State, and, after assigning several reasons (with which we have nothing to do) why the Judge thought it proper to refuse the instruction, it is stated that he left the case to the jury, as they had just been charged. Now, how had they been charged? Why, if from the circumstances, (including, of course, the nature of the weapon, upon which the counsel on each side had argued) the jury were satisfied that it was not the. prisoner’s intention to. kill or do great bodily harm, they should find *184 him guilty of manslaughter ; and, if they should not so find, then the law implied malice, and he was guilty of murder. In this we see no error, upon the supposition that the jury were to judge, whether the weapon was deadly or not; for the charge distinctly leaves that question to them, and it seems to have been the plain purpose ■of the Judge to inform them, that, as they found that fact the one way or .the other, the case would be one of murder or manslaughter, inasmuch as the law inferred therefrom, that the intention was or was not to kill. 'And that proposition is unquestionably correct; and therefore it can afford no ground for reversing the judgment, although the Judge may have erred in leaving it to the jury, and not telling them that the prisoner had not sufficiently established, that the instrument with which he did kill, was not likely to kill. The prisoner then prayed the Judge further to instruct the jury, that if they had a reasonable doubt of the intent, the prisoner was entitled to the benefit of it; which was refused. And in that refusal his Honor was right; for the intent in this case was of that kind which is implied by the law, and therefore was not proper to be left to the jury at all, and, by consequence, the doubts of the jury upon it could not be material. We are not sure, indeed, that the meaning of the prisoner’s counsel, in praying the instruction, is understood by us, as in itself it is not perfectly intelligible. We cannot suppose, that the purpose was for directions in favor of the prisoner, in case the jury had doubts as to the fact of the instrument being a deadly weapon or not; because the terms are “ a reasonable doubt of the intent,” and that expression cannot by any interpretation, of which it is susceptible, embrace the enquiry respecting the nature of the instrument. We must suppose, then, that the instruction asked meant, that, although the jury should find that the weapon was deadly, yet, if they, not-withstandmg, doubted of the actual intent to kill, the prisoner shoqld be acquitted. And, thus understood, the *185 Court conceives the instruction was properly refused, for the reasons just given — that the intention was an implication of law, and not an inference of fact by the jury, from the nature of the weapon and the absence of legal provocation. Indeed, if the instruction had been prayed in reference to doubts about the instrument being a deadly weapon, as we conceive, the Court ought not to have given it to the jury, because, whether an instrument, if it was in fact as described by a witness, be one by which death may or may not be probably caused, is a question of general reason, and therefore proper for the Court; and, if 'it be doubtful, whether it would probably cause death, the Court! we think, should direct a conviction for manslaughter only, as was insisted on in the case stated by Lord Hale, 1 P. C. 456, in which a man, who was called “ a son of a whore” by a woman, took up a broom-stick and threw it at her at a distance, and it hit her upon the head and killed her; and it was submitted to the Judges, after a conviction of murder, whether that striking, which was so improbable to cause death, was murder or manslaughter ; and, they not agreeing on it, the prisoner was pardoned.
The Court is, therefore, of opinion, that there is no ground in either of the objections for reversing the judgment. The counsel here, did not insist on either of the points made by the special instructions prayed for by the prisoner; and we have considered them without discovering any force in them.
So also is our opinion, with respect to the objections taken to forming the jury. The Court has a light to excuse persons upon their application for any reasonable cause; and, certainly, by the consent of the prisoner given by himself or his counsel. In Benton’s case, 2 Dev. and Bat. 196, it was held, that the State’s challenge for cause need not be decided on immediately, but that it was in the discretion of the Court here, as in England it is in the crown officers, to let them stand until the -palie! be *186 gone through. If we were to undertake to revise the exercise of his Honor’s discretion on this subject, we should not differ from what he did in this case.
Therefore this must be certified to the Superior Court, that other proceedings may be had on the conviction, according to due course of law.
Per Curiam. Ordered accordingly.