STATE v. J. S. WILCOX.

*Murder in First and Second Degree—Malice, When Presumed and How Rebutted—Demurrer to Evidence allowed in Supreme Court—Laws 1893, Ch. 85.*

1. The common-law principle that, on trials for murder, malice is presumed from the killing with a deadly weapon, and the prisoner has the burden to rebut malice, is modified by Ch. 85, Laws 1893, only to the extent of making the killing, when nothing else appears, murder in the second degree instead of murder in the first degree.

2. The prisoner must satisfy the jury of the facts and circumstances relied upon to rebut malice, but he is not held to satisfy them beyond a reasonable doubt.

3. If, upon the whole testimony, it is manifest that the presumption of malice has been rebutted, and in no aspect of the testimony, if believed as a whole, can the prisoner be guilty of murder in the second degree, the court should so instruct the jury and direct them not to convict of a higher offence than manslaughter. *E converso* the court may instruct the jury, when the testimony so warrants, that no evidence to reduce the homicide to an offence below murder is before them.

4. Where the whole evidence appears in the transcript on appeal, and the Attorney General does not object, a demurrer to the evidence may be entered in the Supreme Court. If such demurrer is sustained a *venire de novo* will be ordered.

5. Deceased, without any provocation, assaulted the prisoner with a deadly weapon, driving prisoner sixty or eighty steps and then knocking him down. While prostrate on the ground, and while being beaten by deceased with a club, the prisoner shot and killed deceased with a pistol. The killing, under such circumstances, was not murder in any degree, nor would the killing have been murder if prisoner had stood his ground in the beginning of the assault upon him and then shot deceased, and it was error in the court not to so instruct the jury.

INDICTMENT FOR MURDER, tried before *Boykin, J.,* at Spring Term, 1895, of PASQUOTANK Superior Court. There was a verdict of guilty of murder in second degree. Defendant appealed.

*The Attorney General,* for the State.

*Messrs. J. H. Sawyer* and *D. L. Russell* and *E. F. Aydlett,* for the defendant.

MONTGOMERY, J.:   The prisoner at spring term, 1895, of Pasquotank superior court, was convicted of murder in the second degree, and the judgment of the court was that he be imprisoned in the State penitentiary for a term of 15 years. The prisoner having admitted that he killed the deceased with a pistol, the law presumes that he acted with malice, and the burden is shifted upon him to show, not beyond a reasonable doubt but to the satisfaction of the jury, if he can, that the facts and circumstances on which he relies to show mitigation or excuse or justification are true. These he can show from the whole evidence, as well that offered by the State as that offered by himself. And the Act of 1893, Ch. 85, which divides murder into two degrees, modifies this principle of the law only to the extent of making the killing, nothing else appearing, murder in the second degree instead of murder in the first degree, as was the case before the statute. But, in the trial of cases where this doctrine of legal presumption is applicable, it may happen that, when the whole of the proof is in, it is manifest that, looking at it as a whole and in its every aspect, and as to every inference that could be fairly drawn from it, the presumption has been completely rebutted. A part of the testimony may prove simply a homicide and yet afterwards, upon the whole state of facts being made known, there is left no doubt that matters of

justification or excuse or mitigation have been shown. In such a case it therefore appears that, in no aspect of the testimony, in which it may be believed as a whole, can the prisoner be guilty of murder in the second degree, and the court ought to tell the jury that in every view of the whole testimony the presumption has been rebutted, and that they must not convict of a higher offence than man-slaughter, just as the court would have power to tell them that no mitigating or excusing or justifying circumstances, had been shown to reduce the degree of the offence charged, when no such testimony had been in fact intro-duced. *State* v. *Miller*, 112 N. C., 878. "As malice is a presumption which the law makes from the fact of killing, it must necessarily be a matter of law what circumstances will rebut the presumption." *State* v. *Matthews*, 78 N. C., 523.

It was understood upon the argument of this case that the whole of the testimony introduced below was before this Court, and the Attorney General did not desire to interpose objection to the entering here for the first time by the prisoner's counsel a demurrer to the evidence. The testimony is as follows:

FOR THE STATE.

Mrs. Sarah Sherlock: "I am mother of the deceased and he was killed on October 22d, 1894. My child ordered Wilcox out; he would not go; my child stepped aside to get the stick and while he was doing this Wilcox stepped to the door and drew his pistol. (Just before this both parties were in the house at a table where deceased had the registration books of his township.) As Wilcox dropped out of the door with his pistol, Brothers walked to the door and met Wilcox, who was standing at the door. My son, Brothers, kept on repeating "Get out" and Wil-cox would not go, but drew his pistol and pointed it at

him. They moved off the steps a short distance in the yard and I heard the licks of the stick on the pistol. Then Wilcox shot him. I was standing on the piazza and saw him shoot. They were standing face to face. After he was shot, my child hit him with a stick. Then Wilcox fell to the ground and prepared to shoot again and shot him twice on the ground. My son was hitting him between second and third shots while he was on the ground. My son had not struck defendant 'till after he was shot. He was hitting on the pistol. A colored man came that morning, before Wilcox did, and asked if that was the place to register. When defendant came up he looked angry and slightly spoke to me. Son was then in cotton patch. When my son and defendant came to the house they passed the door and went on talking and came in at the front door. Son kept his registration books at the door. He was registrar. Son read the oath to colored man and told him he had not been in the county long enough to vote and that it was not worth while for him to register. Wilcox asked for certificate of colored man. My son said he was not going to give any certificate until the one that wanted it asked for it, and had already given Shannon, the first colored man, a certificate. Then Wilcox wanted to see the registration books. Son said 'No, you don't see the book any more while I have got it.' Wilcox had been there the Saturday before. Then my son ordered Wilcox out second time; then began the matters I have before stated. Wilcox wanted Noah Shannon's certificate, which had been given."

Cross examined: "It was 10 o'clock in the day when Wilcox got there. I was standing on the porch when he got there. Saw them as they came from the cotton patch. They all entered at front door. My son kept registration books on table and people came there to register and he

allowed them to register at table in the hall.   Son came in
first, then Wilcox and colored man stayed on porch.   Table
right at door inside house; club but a short distance from door
in the house.   The stick had been in closet for years ; was a
young man's ; don't know who put it there. (Stick exhibited.)
I gave John Cartwright stick.   It had stains of blood on it.
I gave it to Cartwright unthoughtedly.   Do not desire to
deprive defendant of any evidence.   'I saw blood on defend-
ant while they 'were fighting.   Wilcox asked to see
book, my son shut it up and told him to leave.   Then Wil-
cox went to piazza and my son went to closet and got
the stick.   Wilcox backed to the door and drew his pistol.
My son had not then got the stick.   Defendant then stand-
ing at the door with pistol pointing at him.   Son had stick
in his hand hanging down 'till he got to Wilcox.   Then
son began to strike on pistol, holding stick upright before
him and moving it back and forth, and defendant was try-
ing to shoot him while my son was coming to him, but
did not shoot ; he was waiting to get him out the door.
Wilcox backed from door with pistol presented and my
son following waving stick in front of him and striking
pistol 'till they got near green grassy patch in yard.   Then
Wilcox fell down because he wanted to.   My son had not
struck him then.   Defendant shot my son before he fell.
My son was not hitting Wilcox with stick before he shot
him.   I thought he fell down so that he might shoot my
son.   I did not make any statement about this matter to
Frank Godfrey just after it happened.   The inquest was
at my house.   I was not sworn.   Did not tell Godfrey
that my son went out with stick and · knocked Wilcox
down.   I did not tell Ellis that I could not control my son
that day ; that he got stick and rushed out and knocked
Wilcox down, and then defendant shot, and that it was all
my son's fault.   Did not tell White that my son rushed

out with stick and knocked Wilcox down while he was retreating, and that he was beating him while down when Wilcox shot him. The colored man that was there did not see difficulty."

Dr. W. J. Lumsden : " I was one of the physicians that made *port-mortem* examination. Saw Brothers same day he was shot and found three wounds on him ; one on right arm few inches below shoulder ; one was a superficial wound of abdomen,. and the other a penetrating wound in the adbomen. Fresh wounds made at sametime. Clothes burnt by powder. Brothers killed by penetrating wound in abdomen."

Cross examined.—"Assuming that the jury find as facts that Wilcox was lying on the ground and Brothers was standing over him or nearly over him when the pistol was fired and the ball from the pistol struck Brothers at the point where it entered the abdomen, what course, in your opinion, would the ball take ?" Answer : " Upward and backward. We found that the range of the ball was upward and backward. This was the fatal wound ; cannot say what position. parties were in when the other abdomen wound was made. The ball that made the wound in the arm entered three inches below shoulder joint and passed out about two inches lower down the arm. If Wilcox was retreating and Brothers following waving the stick perpendicularly in front of him the ball could not have entered and made the wound on the arm. The arm must have been well elevated and drawn back at the time the wound was made for such wound to have been inflicted. Defendant and deceased about same size and height. Blows given with the stick exhibited on the head must have been serious, something must have given away. If Brothers hit a fair blow don't see how it could have helped fracturing the skull. Don't think the fatal ball could have

taken the course it did if Wilcox had been on the ground and Brothers in piazza. Wilcox must have been lying down."

#### DEFENDANT'S EVIDENCE.

S. P. Wilson : " On Monday before homicide, Wilcox and myself at Brothers' and Wilcox asked him to put down his full name and Brothers did so. We asked Brothers to correct mistakes he had made in registering Cicero Cale. Said he would not unless Cale was there. Wilcox said, ' Don't see why you should refuse to correct this matter.' Brothers said to Wilcox, ' You have come here for a row, and if I've got to have a row with you I am going to have a d—d big one.' Wilcox said, ' I did not come for any row and don't want any. I have always looked on you toting fair.' Brothers said, ' Mr. Wilcox, any time you want to look over the books you can come and do so, but I don't want you to come bull-dozing.' Wilcox said, ' You misunderstood me ; I did not come here for any trouble or to bull-doze you.' Then they parted friendly. Brothers' house was the place of registration for that township."

J. S. Wilcox : "Am 49 years old ; know Noah Shannon and Brothers. Monday, October 22d, between 10 and 11 o'clock, I went to Brothers' house. Dave Games was there talking to Mrs. Sherlock. Spoke to her, and Games and I went to cotton field after Brothers ; met him and spoke about some peas. When we got to house Brothers entered back door kitchen. Games and I went to front door of house. After Brothers got through with Games I spoke to him. Brothers told Games he had not been there long enough to register. I said, ' Johnnie I'd be much obliged if you'd give me Shannon's certificate ; ' he said, ' Shannon must come after it himself.' I said, ' The other day you told me to come and look over the book any time and get cer-

tificates.' He said, ' You leave here, I've granted you as many privileges as I am going to.' I asked him who was in authority there, he or Mr. Sherlock? his mother's husband. He said, ' Mr. Sherlock, but I am man enough to move you, you God d—d s— of a b—.' Then he rushed to the closet; got the stick and advanced towards me with it drawn. I was retreating and as I got to the steps I threw up my hands to ward off the licks and he struck me on wrist. He followed me up; I was retreating, and from stumbling over something or from a lick I received I fell. He was beating me over hand and arms all the time with stick; split my hand three inches; hit me over the head and knocked me down; struck me several times over the head. Shot him first after I stumbled or was struck. He struck me four times with stick; lick on head knocked me down. He continued to beat me with stick while I was down and I shot again. I got pistol out when I came near falling first time (identified stick). He was hitting me with big end. My face and eyes covered with blood and I did not see him when I shot last time. My horse was at gate, and I was trying to get to horse and leave. I was at piazza steps when he first hit me. Was fifteen or twenty steps away from piazza when I drew pistol, and sixty or eighty steps when he last knocked me down. Was arrested Monday and gave bond. Was re-arrested that evening and gave bond. Games left Brothers' place first and was getting his horse when Brothers got stick. I was deputy sheriff; was at door when he told me to leave and as he rushed for stick I commenced to retreat and was going off the piazza steps when he came up and struck me and did not then have pistol in my hand. Been carrying pistol about my person as deputy sheriff. Was indicted for killing Jennings, but did not kill him and was acquitted. Did not threaten to shoot Newby or my son."

STATE *v.* WILCOX.

Dave Games : " Was at Brothers' that morning. Wilcox and I went after Brothers, met him and I told him I wanted to register. We went back to house. Brothers went in back door and Wilcox and I in the front door. Brothers told me I had not been there long enough and I started to get my horse. As I left piazza Wilcox asked him for certificate for Shannon. When I got to fence heard racket ; looked around and Brothers was hitting Wilcox, who was walking backward and throwing up his hands and Brothers was hitting at him with a stick. Brothers knocked him down, and while he was down Wil. cox shot one time. Wilcox then got up and backed back. Brothers began to strike Wilcox again while he was retreating ; he did not get very far before Brothers knocked him down again and then defendant shot him again, and Brothers was standing right over him with stick drawn when he shot. Brothers slapped his hands to his stomach and threw stick down. This was last shot ; white lady standing in piazza saying something when fuss was going on, but I can't tell what she was saying."

Cross-examined : " Heard two shots only. Did not get on my horse till last shot. Then I left and went to Week's and told some of them about it, but did not say that I did not know who did the shooting. Don't know whether Brothers hit Wilcox with stick while he was down or not." (Games' examination before magistrate read, which was, in substance, the same.)

Jennie Perkins : " Was at Mrs. Sherlock's that day. Heard licks. Mrs. Sherlock said, ' Johnnie don't have any fuss.' This was after I heard licks. Then I heard other licks, then pistol went off. Only heard two shots."

John Cartwright : " Defendant married my sister. I went to Mrs. Sherlock's and got the stick and there was blood on big end of stick. She said Brothers told Wilcox

to leave; that Brothers went to closet, got the stick and she told Johnnie not to have any fuss, that Wilcox was at piazza and Brothers went there and hit him with the stick. She pointed out a bunch of flowers in yard and said, ' There is where the fight was.' Then she cried and said, ' Oh, if Johnnie had minded me there would have been nothing of it.' The bunch of flowers was half between house and gate. Some blood there."

F. M. Godfrey: "I acted as coroner in this matter. Mrs. Sherlock was sworn and made a statement before me. She said Wilcox was down on the ground when he shot Brothers. William Pailin was present and said, ' She is not in a condition to give testimony,' and she then stopped and went away. I think she knew what she was talking about." Cross-examined.

H. C. Markham: "I was one of the jurors and Mrs. Sherlock said that Wilcox wanted to look at the book and Brothers told him he could not do it and to get away and he refused to leave; that Brothers went to the closet, got the stick and made for Wilcox and Wilcox retreated towards door and Brothers began to strike at him, Wilcox retreating; that Wilcox did not draw his pistol 'till Brothers struck him; that shooting was done out there— pointing to the green bunch in the yard. She was crying."

M. T. Sawyer: " Saw Mrs. Sherlock next day after shooting. She said if she had known Wilcox she would not have told him Brothers was in the field. That she told her son not to have any fuss. She was crying."

W. H. Ellis: " Was at Mrs. Sherlock's Tuesday at 2 o'clock and she said Wilcox came there yesterday and killed her boy. She said it was on account of them devilish books; on account of a darkey who wanted a certificate that Johnnie would not give him. That John hit

STATE v. WILCOX.

first lick. If he had minded her there would have been nothing of it; that he followed Wilcox out yonder to that green spot and knocked him down and that's where Wilcox shot him. That John followed Wilcox from piazza and was beating on him."

William Morris: "Saw defendant soon after difficulty. He showed me his wounds; said it pained him."

Dr. Griggs, after describing wounds, said they indicated a severe thrashing with a stick or club like one exhibited. Defendant had transverse wounds across his head 2½ inches long. Another on right side of head, above right ear; in rear another wound; there was fourth wound on head; back of left arm was bruised, hand severely cut between thumb and finger, wound 2½ inches long, tearing skin; large bruise on right shoulder, discoloration about neck and face.

STATE IN REPLY.

George A. Scott: "Saw Games going towards Brothers' the morning of fight. Wilcox passed after him. Saw Games returning riding very fast and said Wilcox and the man that registers were fighting and shooting; don't know who was doing the shooting."

Cross-examined: "Saw defendant after the fight; he was badly bruised; blood on his face and head so that he could scarcely see; so much blood on his head I could not see wound and he said Brothers was beating him as hard as he could when he shot him. This was about ten minutes after the fight."

Dr. Lowry: "Helped make *post-mortem* examination. There was penetrating wound on the abdomen and another superficial one." If the jury shall find as a fact that Brothers had been standing on the piazza step and Wilcox on the ground below, and Wilcox shot the deceased and the ball struck at this point when it entered the abdomen,

could the penetrating wound in the abdomen have been made? Objection and objection overruled. Exception by defendant; his second exception. Witness answered: "Yes." Objection to answer and objection overruled; defendant excepted; his third exception.

Dr. McMullan: If the parties had been facing each other and Brothers was waving the stick from side to side the wound in the arm could have been made by defendant with the pistol. Was at inquest. Mrs Sherlock was so prostrated she was incapable of making a coherent statement. She could understand and answer any ordinary question.

Dr. Wood: Testified as to location and nature of wounds on defendant and said they must have been made with club or stick.

We will now examine the testimony from the stand-point of the demurrer and determine whether or not, in any aspect of the whole testimony, the prisoner is guilty of murder in the second degree. Such examination for the end we have in view must be made, not by weighing or comparing or contrasting the testimony which is favorable to the prisoner, and then drawing a conclusion of probabilities or preponderancy, but in critically analyzing and arranging all of the testimony which is unfavorable to the prisoner, and then to consider its legal effect when compared and studied with the rest of the testimony, with the view of determining whether or not, upon the whole and from any and every point of observation of the whole, the presumption of malice has been rebutted. For the purposes of this discussion, then, no amount of testimony favorable to the prisoner, however much of such may appear, can be considered by us if there is any sufficient proof from any aspect of the whole testimony to be submitted to the jury upon which the prisoner ought to be convicted of mur-

STATE *v.* WILCOX.

der in the second degree.   It may be safely said, however, that the whole of the testimony in this case tends to prove that the fight was a sudden one ; secondly, that the prisoner was where he had a right to be ; third, that his conduct was proper up to the time of the actual collision ; fourth, that the deceased was the aggressor—and with a deadly weapon; fifth, that there was no proof that the pistol was prepared by the prisoner ; and, sixth, that the shot which killed the deceased was fired while the prisoner was lying on the ground and being beaten by the deceased with a stick or club—a deadly weapon ; and, seventh, that the whole of the testimony offered by the defense is favorable to the prisoner.    The only witness for the State who saw the fight and the shooting, whose testimony alone, of all the witnesses, is unfavorable to the prisoner, was the mother of the deceased. We are not disposed to harshly criticise the testimony of this witness, for we are mindful of the relation between her and the deceased.    Her excitement at the time of the homicide and her grief following, and especially manifested on the day of the coroner's inquest, must have been intense.

The testimony of this witness, whatever else it may tend to prove, shows that the deceased, without the least provocation, made a sudden and violent attack on the prisoner with a deadly weapon—a stick so large as to be called a club by the witness ; that the deceased violently and forcibly with this deadly weapon drove the prisoner before him out into the yard 60 or 80 steps from the porch, and that the pistol was fired while the prisoner was prostrate on the ground and being beaten by the club in the hands of the deceased ; and the stick was seen by her to be bloody after the fight, and that there was blood seen by her on the prisoner during the time the fight was going on.

Under this testimony, viewed from the whole, the prisoner was not guilty of murder in the second degree.   If

the jury had believed her testimony to be true, and all the witnesses besides swore falsely, the killing at most would not be murder in any degree.   Even if the prisoner had been willing to fight, and could have escaped the threatened assault of the deceased armed with a deadly weapon, had he so desired, but chose to stand his ground and shoot, and have shot and killed the deceased in the beginning of the assault in the doorway, the offence would not have been murder in the second degree.   *State* v. *Kennedy*, 91 N. C., 572.   Certainly the driving and forcing of the prisoner by the deceased in the manner described even by this witness, to the spot where the homicide took place, but aggravated the assault and gave greater provocation to the prisoner. This witness said nothing about the injuries of the prisoner; but he was badly beaten.   The physician who saw and examined the wounds said : " He had transverse wounds across his head two and a half inches long, another on right side of head about right ear, in rear another wound ; there was a fourth wound on the head, back of the left arm was bruised, hand severely cut between thumb and finger, wound two and a half inches long tearing skin, large bruise on right shoulder, discoloration about neck and face."   It makes no difference when these wounds were inflicted, whether before or after the prisoner fell upon the ground, for under the circumstances of this case there was no element of murder in the act of the prisoner.   In *State* v. *Ingold*, the court below instructed the jury that " if the prisoner willingly entered into the fight, and during its progress, however sorely he might be pressed, stabbed the deceased as described by the witnesses, his offence at least would be manslaughter," but upon appeal this Court said, supposing there was evidence to raise this point, the offence, according to all the authorities, " was excusable homicide."

But we are not considering now whether the prisoner fought willingly or not, or whether the facts in this case make the killing of the deceased by the prisoner excusable on the ground of self-defense.    That may be for a future trial.    There was testimony, however, going to show that the killing was justifiable on the ground of self-defense, and none, taken in connection with the whole evidence, that was sufficient to be submitted to the jury to convict the prisoner of murder in the second degree, and the court ought to have instructed the jury that, in every aspect of the testimony, the presumption of malice had been rebutted.

New Trial.