STATE v. CAPPS.

(Filed March 1, 1904).

1. HOMICIDE—*Murder—Evidence—Acts 1893, ch. 85.*

In this indictment for murder there is no evidence of manslaughter, the presumption of malice arising from the killing with a deadly weapon not being rebutted.

2. EVIDENCE—*Homicide.*

Where one accused of murder had deliberately shot into a house and killed an inmate, evidence that accused was on friendly terms with the family of the deceased is not competent.

3. PUNISHMENT—*Judgments.*

Where the sentence of the trial court is within the limit fixed by law, it is not excessive.

INDICTMENT against George Capps, heard by *Judge W. B. Council* and a jury, at February Term, 1904, of the Superior Court of BEAUFORT County.

The defendant was indicted in the Court below for the murder of Augustus Tuten, and having been convicted of murder in the second degree appealed to this Court.

The evidence tended to show that the deceased, who was a boy seven years old, lived with his grandmother, Mary Mc-culloch, whose house was about thirty or forty yards from the home of the defendant. The house had only one room, and at the time of the homicide there were in this room Mary McCulloch, her three daughters Georgia, Florence and Annie, and the little boy who was killed by the defendant some time in the afternoon between 4 o'clock and sunset, one of the witnesses stating that he heard the gun fire about 5 o'clock, and another that she heard it about 4 o'clock. The defendant came directly from his house to

the McCulloch house and had with him a single-barrel gun, into which he placed a shell as he was approaching the house of Mary McCulloch. The principal facts are stated by one of the witnesses for the State, Georgia McCulloch, who testified as follows: "When the defendant got to the house he called me and said: 'Georgia, come here a minute.' I said: 'I have not got time.' He said again: 'Come here a minute,' and I said: 'I have not got time.' Defendant was at the gate when he began calling me. When I said 'I have not got time,' he said: 'You are scared of me, ain't you?' I said: 'No, sir, I ain't scared of you; I am cool.' He said: 'You act like you are scared of me.' I was sitting at the sewing machine during this conversation. I left the machine about the time it was over and went up to the fire to warm my hands. While I was warming my hands my sister Florence said: 'Mr. Capps, when I go to your house I recognize your house, and when you come to mamma's I want you to do the same.' He then said: 'Florence, 'tain't worth while for you to begin to cut up, God damn it, I am going to shoot.' At the time the defendant and Florence were talking defendant was standing on the doorstep. He then raised his gun and presented it and fired it right through the door into the house. When the defendant shot, I saw the boy fall in the middle of the floor, between the two doors. I saw the boy after he fell. He was shot in the side. As the boy fell he put his hand to his head and side, and said 'Uncle George has shot me.' I was about three steps (nine feet) from the boy when he was shot. The boy, myself, my mother and my sisters, Florence and Annie, were in the house when the shooting occurred. After the shooting the defendant walked around the house and went away." This witness further stated that the defendant did not like any of the McCulloch family much; that he sometimes quarreled with the little boy,

that the gun was pointed in the direction where the deceased stood at the time he was shot, and that the defendant said nothing to or about the boy before he fired the gun. The evidence of the witness Georgia McCulloch was, in all essential particulars, corroborated by the testimony of Mary McCulloch and her daughter Florence. The witness Florence Tuten also testified that the defendant "shot right through the house," and when he shot he was twelve or fifteen feet from where the boy fell. After the defendant fired the gun he immediately left the house and went towards the main road and passed by his own house without stopping; that "he put up the gun to his face and seemed to take aim," but she was unable to say whether or not he put the breech to his shoulder. She further stated that before the shooting occurred the defendant's wife came over to their house, and she heard her say: "George, your gun is going to get you into trouble."

Laura Collins, a witness for the State, testified: "I remember when Gus Tuten got killed. I saw the defendant twice that day. The last time I saw him was in the evening at Mary Tuten's house. I heard a noise or fuss over there. I stopped and heard the defendant say 'I am going to shoot,' and saw him raise his gun and take sight along the barrel and fire into the house. After shooting he turned and walked away from the house. · I hid in the bushes and he passed me with his gun in his hand. It was a single-barrel breech-loading shotgun. I heard the defendant doing loud talking before the shot was fired. When he passed me after the shooting the defendant had passed his own house, going on. The shooting occurred about 4 o'clock on Saturday evening. I saw the defendant with the greens in his arms that evening as he went towards Mary McCulloch's house. On his way over there he did not stop at his

STATE *v.* CAPPS.

house or at the gate. His wife was behind him as he went over. The gun was against his face when he shot."

Annie McCulloch, a witness for the State, testified: "I was present at the time the boy was shot. I heard the defendant say 'I am going to shoot, damn it,' and he raised his gun up and shot right in the house and struck Gus and killed him. I dodged out of the way when I saw he was going to shoot. The defendant left after the shooting. The back and front doors were both open at the time he shot. The defendant gave Georgia some greens that evening when he came over to our house and she took them. I do not know where the boy was standing when the defendant came to the door."

Alexander Watson, a witness for the State, testified: "I live about a quarter of a mile from the defendant and Mary McCulloch. I recall the time Gus Tuten was said to have been shot. I heard the gun fire about 5:15 that evening. I saw the defendant as he was going home that evening about 5 o'clock. He had his gun then. His wife and Mary McCulloch were with him. They had some greens. I did not speak to the defendant, nor he to me. About 8 or 9 o'clock that night I saw the defendant again. He came to my house and wanted me to go to his wife and get his clothes for him. I said you had better leave here. A few minutes later he came back to the house and asked me to let him go up stairs and I agreed that he could do so."

There was testimony tending to show that the defendant was not drinking, nor under the influence of liquor when he committed the homicide. The jury rendered a verdict of guilty of murder in the second degree and judgment was entered thereon, to which the defendant excepted and appealed.

134——40

*Robert D. Gilmer, Attorney General,* for the State.

*Small & McLean* and *E. F. Simmons,* for the defendant.

WALKER, J., after stating the case.    The defendant's counsel at the close of the testimony requested the Court to give certain instructions to the jury, which it refused to do, but we do not deem it necessary to consider or discuss them, as all of the questions intended to be presented by the other exceptions of the defendant are raised by the defendant's exception to one of the instructions given by the Court in its charge to the jury.    The Court charged the jury correctly in regard to murder in the first degree, and also as to the circumstances under which the defendant would be entitled to an acquittal, but told the jury that in no view of the evidence could they convict him of manslaughter, and in this connection the jury were instructed as follows: "If you find from the evidence, beyond a reasonable doubt, that the defendant shot the deceased with a gun, inflicting a wound from which death resulted, but you are not satisfied beyond a reasonable doubt that the shooting and killing were the result of wilful premeditation and deliberation, then your verdict should be that of murder in the second degree.    If it resulted from wilful premeditation and deliberation, then your verdict should be guilty of murder in the first degree.    In no view of the evidence, if you believe it, can you return a verdict of manslaughter."

The question then is, was there any evidence, if the testimony is considered in the most favorable light for the defendant, upon which the jury could have returned a verdict that the defendant was guilty only of manslaughter? The defendant could not have his case presented here in a more favorable aspect for him than it is by this charge

of the Court, because if there is any view of the evidence which the jury might have taken, and which would have reduced the grade of his offense from murder to manslaughter, he is entitled to have us consider the case in that view. We have not discovered any evidence which entitled the defendant to an acquittal, if the jury found as a fact, which fact seems to have been admitted at the trial, that he killed the deceased with a deadly weapon; and we do not understand it to be seriously contended before us that there was any such evidence. The defendant's counsel, as it appears in the record, virtually admitted the killing with a deadly weapon, and also requested the Court to charge the jury "that upon all the evidence in the case, if believed by them, the jury can find the defendant guilty of murder in the second degree or of manslaughter." The real question therefore is whether there was any evidence to reduce the grade of the offense from murder in the second degree to manslaughter.

There is no principle in the criminal law better settled than that, where the killing with a deadly weapon is admitted, or proved, in the sense that it is established as a fact in the case, the law implies' or presumes malice, and at common law the killing, if nothing else appears, is murder. *State v. Willis*, 63 N. C., 26; *State v. Johnson*, 48 N. C., 266; *State v. Brittain*, 89 N. C., 481. When this implication is raised by an admission of proof of the fact of killing, the burden is upon the defendant of showing all the circumstances of mitigation, excuse or justification to the satisfaction of the jury. *State v. Johnson* and *State v. Willis, supra; State v. Vann*, 82 N. C., 631; *State v. Barrett*, 132 N. C., 1005, and that burden continues to rest upon him throughout the trial. *State v. Brittain, supra*. As malice is an implication or presumption raised by law from the fact of the killing, it must needs be a mat-

ter of law as to what facts or circumstances which the evidence tends to establish will or will not rebut the presump-- tion. *State v. Matthews,* 78 N. C., 523; *State v. Byrd,* 121 N. C., 684; *State v. Wilcox,* 118 N. C., 1131; *State v. Craton,* 28 N. C., 164; *State v. Johnson, supra.* Whether the evidence sufficiently establishes the facts or circumstances which will constitute a rebuttal of the implication of the law must, as surely, be a question of fact for the jury to pass upon, and when therefore there is any evidence tending to show these facts or circumstances, it is the duty of the Court to submit them to the jury with proper instructions as to what will be sufficient to rebut the presumption, so that the jury may finally decide whether or not the presumption has been met and overcome by the defendant. It follows that whether there is any evidence in this case to rebut the implied malice is a question of law. When there is a killing with a deadly weapon, the law, as we have said, implies the malice, and the offense at common law is murder, and under the Act of 1893, chapter 85, it is murder in the second degree, if there is nothing in the case to reduce the homicide to a lower grade. *State v. Wilcox,* 118 N. C., 1131. This being so, all matters in mitigation or excuse must be shown in the same way as at common law, if the defendant would reduce the offense to manslaughter, or acquit himself altogether of the charge.

We have examined the testimony set forth in the record with great care and have been unable to find anything which tends in law to extenuate the crime of which the defendant was convicted, and there is certainly nothing to excuse it. Instead of rebutting the implied malice, the evidence tends to strengthen and confirm the presumption raised against the defendant from the act of killing with a deadly weapon. The malice necessary to constitute murder may exist, though there was no intent to kill or even to injure the particular

person or any one else. It is implied when an act dangerous to others is done so recklessly or wantonly as to evince depravity of mind and a disregard of human life, and if the death of any person is caused by such an act it is murder. *Dunaway v. People,* 110 Ill., 338, 51 Am. Rep., 686; *Pool v. State,* 87 Ga., 530; *Galliher v. Commonwealth,* 87 Am. Dec., 493; *Washington v. State,* 60 Ala., 16, 31 Am. Rep., 28; *State v. Edwards,* 71 Mo., 312; 1 McLain Cr. Law, section 325; 1 Wharton C. L., section 319; 21 Am. & Eng. Engcy. Law, 153.

We believe the authorities cited support the general rule laid down, and several of the cases, while not presenting precisely the same facts, cannot be distinguished in principle from the case under consideration. In Clark's Criminal Law, p. 190, the rule is thus substantially stated: Where a person does an act with knowledge that it will probably cause death or grievous bodily harm to some person, although he has no actual intention to injure any person, but may wish the contrary, and death ensues from his act, he is guilty of murder. Thus, if a man recklessly throws from a roof into a crowded street a heavy piece of timber which kills a person in the street, or if he intentionally fires a pistol in a crowded street and kills another, in either case it is murder. In *Pool v. State, supra,* the Court says: "The law infers guilty intention from reckless conduct; and where the recklessness is of such a character as to justify this inference, it is the same as if the defendant had deliberately intended the act committed. When therefore one recklessly fires a pistol with criminal indifference as to the consequences and another is killed, it is not necessary, in order to constitute this killing murder, that the accused should at the time of firing have been engaged in the commission of some unlawful act, independent of and in addition to the reckless firing itself." In *Brown v. Commonwealth* (Ky.), 17 S. W. Rep., 220, it

is said by the Court: "If we are mistaken as to there being evidence of the appellant's malice towards the deceased in particular, it is clearly established that the appellant, without lawful excuse, intentionally fired the pistol in a room crowded with persons. If he did this, not with the design of killing any one, but for his diversion merely, but killed one of the crowd, he is guilty of murder; for such conduct establishes 'general malignity and recklessness of the lives and personal safety of others, which proceed from a heart void of a just sense of social duty and fatally bent on mischief.'" In the case of *Aiken v. State,* 10 Tex. C. App., 610, it appeared that the defendant fired his pistol into the window of a passenger car in which he knew there were passengers, and the Court said in discussing the case that "where an act unlawful in itself is done with deliberation and intention of mischief or great bodily harm to particular individuals, or of mischief indiscriminately, fall where it may, and death ensues, against or beside the original intention of the party, it will be murder. The intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of a forbidden act, and this rests upon the principle that a man is always presumed to intend that which is the necessary or even probable consequence of his acts, unless the contrary appears." It is further said by the Court that "according to the evidence, the defendant fired his pistol into the window of a passenger car of a railroad train in which, it is shown, he must have known and did know there were passengers. The deceased was struck by the ball and died in a minute or two thereafter from the effects. More reckless disregard of human life was never shown and can scarcely be imagined, and the act, under the circumstances developed, is and could be in law nothing short of murder." If it be suggested that the killing might have been done accidentally and without

STATE *v.* CAPPS.

negligence, in which case the defendant would be entitled to an acquittal; or that it was done recklessly but without intention to kill, in which case the defendant would be guilty only of manslaughter, there is no evidence, as we think, to sustain either view. Such a suggestion is fully met and answered by the case of *State v. Vines,* 93 N. C., 496, 53 Am. Rep., 466, in which *Merrimon, J.,* speaking for the Court, says: "The test of responsibility depends upon whether the conduct of the person accused was unlawful, or, not being so, was so grossly negligent, reckless or violent, as necessarily to imply moral impropriety or turpitude. In some cases it may be difficult to determine the grade of the offense, but the case before us leaves no ground for doubt or hesitation in determining that it is at least one of manslaughter; indeed in one aspect of the case it was murder. There was some evidence going to show the wilful purpose of the prisoner to shoot without regard to the consequences, and if this purpose existed it was murder. If he had been allowed to say that in his opinion the shooting was accidental, this could not have materially changed the case, because the prisoner had used the loaded pistol in an unlawful and reckless manner, and whether the firing was accidental or not made no difference. The law does not tolerate such use of deadly weapons, and when fatal consequences result from it the offender cannot be held guiltless; in such case he must answer for the consequences. It would be monstrous and shocking to reason to allow a man to so use a loaded pistol, and then take shelter behind the fact that the firing was accidental."

The defendant, on the cross-examination of some of the State's witnesses, proposed to show that he had been friendly with Mary Tuten and her family at the time when the homicide was committed, and also proposed to show certain facts and circumstances from which his friendly feeling towards

them could be inferred by the jury. The Court excluded the evidence and we think it did so properly. This evidence, if admitted, could not have reduced the grade of the homicide. A defendant must show something more than a mere friendly disposition towards the person killed if he would justify, excuse or mitigate his offense. It was so decided, as it seems to us, in *State v. Johnson, supra.*

The evidence in this case tends to show that the defendant's anger was aroused by the refusal of Georgia McCulloch to come to the door of the house when he called her, and perhaps by what Florence Tuten said to him at the time. This reference to the testimony is made, not so much to show that there was evidence in the case of actual malice, as to show that the evidence not only does not rebut the implication of malice, but rather tends to confirm it.

The defendant excepted to the judgment upon the ground that the punishment imposed is excessive. The sentence of the Court was entirely within the limit fixed by the law. It imposed only the extreme punishment for manslaughter. We do not think, in any view of the evidence, that it was excessive. *State v. Miller,* 94 N. C., 904.

Upon a review of the whole case, our conclusion is that the rulings and charge of the Court were correct.

No error.