STATE OF NORTH CAROLINA v. KERMIT SMITH, JR.

No. 124A81

(Filed 2 June 1982)

1. **Criminal Law § 98.2; Jury § 6— denial of motion for individual voir dire and sequestration of jurors—discretionary motions—proper opportunity to be heard**

　　The trial judge did not abuse his discretion in denying defendant's written motions requesting individual sequestration of the jurors during voir dire, and sequestration of the jury and the State's witnesses during the trial pursuant to G.S. 15A-1214(j), G.S. 15A-1225, and G.S. 15A-1236(b). Nor did the record support defendant's contention that he was prevented from speaking in support of the written motions.

### 2. Robbery § 4.2— common law robbery—sufficiency of evidence

The evidence was sufficient to support defendant's conviction of common law robbery where the evidence tended to show that defendant went to a college intending to steal money from students and that he took money from a victim as he threatened her with what appeared to be a deadly weapon soon after he kidnapped her and two companions and where the evidence tended to support a conclusion that defendant stole money from the victim before he raped and killed her at another spot.

### 3. Criminal Law § 114.2— no expression of opinion in statement of evidence or contentions

The trial court accurately stated defendant's contentions and fairly stressed the contentions of the State and defendant in his final instructions to the jury even though the statement of defendant's contentions seemed sparse or brief in comparison to those presented in the State's behalf since defendant did not offer independent evidence at the guilt phase, did not substantively negate the weight of the State's circumstantial evidence, and did not specifically request further elaboration by the trial court upon any point of contention in the case.

### 4. Criminal Law § 114.2; Homicide § 25.2— instructions regarding cause or provocation to kill

A statement in the course of the court's instructions to the jury that there was no evidence of "any just cause or legal provocation to kill" in the case was neither erroneous nor prejudicial since the contested statement was merely a legal recognition, correctly made upon the record, that the State's evidence had not disclosed the presence of just cause or adequate provocation to excuse the killing and that the defendant had not fulfilled his burden of going forward with or producing any such evidence either. Further, there was no indication that the jury was misled or confused by the trial court's remark. G.S. 15A-1222.

### 5. Criminal Law § 135.4— sentencing phase—failure to give peremptory instruction about defendant's mental impairment proper

The trial court did not err in failing to give a peremptory instruction about the defendant's impairment under G.S. 15A-2000(f)(6) where ample evidence was introduced at the guilt phase of the trial which authorized a reasonable inference and conclusion by the jury that defendant had the capacity to appreciate the character of his conduct and the ability to conform it to legal requirements when he murdered the victim, despite the contrary opinions of the psychiatrists.

### 6. Criminal Law § 135.4— sentencing phase—duty to recommend sentence of death

The trial judge correctly informed the jury that it had a duty to recommend the sentence of death if it made the three findings necessary to support such a sentence under G.S. 15A-2000(c).

7. **Criminal Law § 135.4— sentencing phase—failure to instruct on possibility of inability to agree on punishment proper**

   The trial court properly failed to instruct the jury that the court would impose a life sentence if the jury could not unanimously agree on a recommendation of punishment since it is improper for the jury to consider what may or may not happen in the event it cannot reach a unanimous sentencing verdict.

8. **Criminal Law § 135.4— sentencing phase—trial court's inability to set aside recommendation of death**

   The trial judge has no authority to set aside the jury's recommendation of death upon its own motion after the jury has made the necessary findings to support imposition of the death penalty under G.S. 15A-2000(c).

   Justice CARLTON did not participate in the consideration or decision of this case.

   Justice EXUM dissenting as to sentence.

ON appeal by defendant as a matter of right from the judgment of *Fountain, Judge,* entered at the 27 April 1981 Criminal Session of HALIFAX Superior Court, imposing the sentence of death upon the conviction of first degree murder. Defendant's motion to bypass the Court of Appeals for review of his additional convictions of second degree rape and common law robbery was allowed on 7 October 1981.

Defendant was charged in indictments, proper in form, with the first degree murder, first degree rape and armed robbery of Whelette Collins. The charges were consolidated for trial over defendant's objection. The jury subsequently found defendant guilty of first degree murder, second degree rape and common law robbery. The trial court ordered the imposition of the death penalty for the murder conviction in accordance with the jury's recommendation. The trial court also sentenced defendant to consecutive prison terms of forty years and ten years for his convictions of rape and robbery, respectively.

The State's evidence tended to show the following. Three black girls, Whelette Collins (the victim), Dawn Killen and Yolanda Woods, were students and cheerleaders at Wesleyan College in Rocky Mount, North Carolina in December 1980. During the early evening hours of 3 December 1980, the girls cheered at a basketball game held in the college gymnasium. After the game was over, the girls left the gym and walked to Whelette Collins' automobile which was parked at a nearby campus lot. It was ap-

proximately 7:30 p.m. [The girls were still wearing their cheerleading uniforms.] The girls had just gotten into the car and were preparing to depart when the defendant, a young white male, suddenly appeared at a window and asked for a ride to the highway. They told this stranger that they were not going in the direction of the highway and refused his request. Defendant thereupon brandished what appeared to be a pistol and demanded entrance into the vehicle.[1] He then got into the car, in the back seat behind the driver. He told the girls that he was an escaped convict and needed a lift to his getaway car. He also told them that they were simply "at the wrong place at the wrong time." Whelette Collins then proceeded to drive where defendant directed, as he continued to hold the gun in his hand.

The group eventually reached and stopped at the place where defendant's automobile was parked in some woods not far from campus. [They had been driving around for a while in what seemed to be circles.] Defendant took the key to the Collins' car and asked the girls if they had any money. Dawn Killen and Yolanda Woods replied that they did not have their handbags with them. Whelette Collins said she had "a little bit." Defendant ordered the girls to get out of the car. Dawn and Yolanda got down on the ground and began to pray. While they were doing so, they overheard a discussion between defendant and Whelette about the money. Defendant asked Whelette, "is that all?" because she only had $7.00. Defendant then took the key to Whelette's car and told the girls to go to the other car. He explained that he was going to drive them to another location, about forty miles away, so he could have "plenty of time to get away" before the police were notified. Defendant made Dawn and Yolanda get into the trunk of his car and, because there was not enough room for her there, told Whelette to lie face down on the back seat.

Defendant then drove the girls to a quarry pit in a heavily wooded area adjacent to the Roanoke River in Halifax County

---

1. It was later discovered (and shown at trial) that this pistol could not fire a bullet and was not, therefore, a deadly weapon in reality. It was a blank .22 or "toy" pistol, similar to that used to start races, with mud in its barrel. The pistol's true character was not, of course, immediately apparent in the dark or to one unfamiliar with firearms.

near Weldon, North Carolina. They arrived at this place at approximately 9:30 p.m.

Defendant told the girls that they would have to wait in this deserted spot with him until "his friend" came with another car at 12:00 or 1:00. The girls were uncomfortable because it was extremely cold that night (below freezing). They were also very frightened because defendant kept telling them that "his friend" would kill them if he discovered that defendant "had taken all these people hostage." Defendant also warned the girls that he might have to hurt them if they did not listen to him.

During the course of the evening, defendant forced Dawn and Yolanda to get back into the trunk of his car and shut it. He said he was going to show Whelette the way back to the highway. The girls in the trunk could hear defendant talking to Whelette. He was telling her that she was "very pretty," that he "couldn't tell whether she was black or white or Italian because she was very fair" and that "if they had met under different circumstances they might be friends or something like that." The girls in the trunk then heard a scuffle and a frightened scream. Whelette yelled out and started running away. Defendant slammed the keys down on top of the trunk and said to its helpless occupants, "I'll be right back." Shortly thereafter, the two girls thought they heard the sounds of gunshots.

About an hour and a half later, Dawn and Yolanda heard someone crying. Whelette knocked on the trunk and asked her friends how they were. They said they were fine and asked Whelette if *she* "was all right." Whelette replied, "no, she wasn't all right." Whelette was still crying, and her friends "could hear the pain and everything in her voice." Whelette asked defendant, "why had he done this to her." He said, "you don't understand my motivation." Whelette then told defendant that she was cold and asked him to get a blanket out of the trunk for her. Defendant refused and told her that the other girls needed the blanket to keep warm. Whelette complained, however, that "they have their clothes on and they have coats and I don't and I'm cold." Defendant merely responded, "your friends would get upset if they saw you standing here without any clothes on." He then snickered and said to her, with a sadistic tone in his voice, "I can put you out of your misery." A while later, he told Whelette that they would go back to where he had thrown her clothes.

For over an hour, Dawn and Yolanda heard nothing but "dreaded silence." Defendant subsequently returned to the car and opened the trunk. He was alone. The girls inquired as to Whelette's whereabouts. Defendant told them that she had stopped at the quarry to use the bathroom. They called for her but received no reply. Defendant suggested that *one* of them go with him to look for Whelette. Dawn and Yolanda refused to do so unless both went, and they stayed in the trunk.

About twenty minutes later, defendant permitted the girls to get out of the trunk. He was "shaking." He told the girls that:

> None of this would have happened if [they] had had some checkbook or some money with [them], because he was cold and his family didn't have any money and didn't have any heat and he wanted—he really needed money, so thinking that he would realize it was around Christmas time, most college students have money to go home.

At this point, Dawn and Yolanda told defendant that they had money back in Rocky Mount. Defendant agreed to take them there to get it. The girls got in the car again, and defendant began to drive away. He did not, however, drive in the direction of the highway; instead, he drove them even deeper into the woods. When defendant stopped the car again, Yolanda and Dawn attacked him with a straight pin and a lug wrench which they had concealed on their persons during their sojourn in the trunk. [During the struggle, the girls noticed that defendant was wet, particularly his pants.] Defendant told the girls that he was going to kill them. Yolanda, however, wrestled the gun from defendant's grasp and unsuccessfully tried to shoot him with it (see note 1, *supra*). The girls then ran away and hid in some nearby underbrush until daylight. [It was then 4:30 a.m. on 4 December 1980.] As they waited there, they heard a splash as defendant threw "something into the water." The girls did not see or hear their companion Whelette during this time.

At about 7:00 a.m., Dawn and Yolanda began to make their way out of the woods. When they reached the interstate highway, they flagged down a vehicle and told its driver their horrible story. Law enforcement officials were soon contacted (by 9:00 a.m.). The girls gave the officers the gun they had taken from defendant and described the place where they had been re-

strained throughout the night. The Sheriff of Halifax County, William Clarence Bailey, arranged for the girls to be transported to the area of a gravel pit on the Roanoke River with which he was familiar. The scene of the crimes was subsequently located.

Defendant was attempting to leave the area when the officers and witnesses arrived. He was bloody, his clothes were wet, water was running off of his hair, and he was barefoot. Dawn and Yolanda identified him as their assailant on the spot, and he was quickly apprehended and arrested.

As soon as defendant was in custody, police officers began searching the woods for Whelette Collins. Many items of evidence were found, including the victim's clothes, defendant's wet and bloody underwear, and two cement blocks with blood, hair and skin on them. The nude body of Whelette Collins was recovered from a shallow pond. Her feet were jammed into a cement block. An autopsy was performed very soon thereafter which revealed the following. Live sperm were in the deceased's vaginal area, there were numerous lacerations and bruises about her face and body, and several of her ribs were fractured. The victim's skull was severely fractured in several places due to the force of blunt trauma to her head. There were also scratches and scrapes on the back of the body which indicated that it had been dragged on the ground. It was determined that Whelette Collins died as a result of the head injuries she had received and not from drowning. [There was no water in her lungs.]

Defendant was also searched by police officers shortly after his arrest. Seven dollars in currency and a ring were retrieved from his person. The ring belonged to Whelette Collins. No money was found in her clothing. Defendant was properly advised by the officers not to make any statement at that time. Despite these admonitions, however, defendant told them that: "it won't even a real gun anyway. I was just trying to scare the girls. . . . I think she was dead before I threw her in the pond anyway."

Defendant offered no evidence at the guilt phase of his trial.

The State did not offer additional evidence at the sentencing hearing held pursuant to G.S. 15A-2000. However, four witnesses testified in defendant's behalf, including his father and two psychiatrists. In sum, the testimony of these witnesses tended to

show the following. Defendant was twenty-three years old, physically healthy, legally sane and very intelligent. However, defendant had "antisocial personality," a disorder in which "the moral and acted principles of the mind are strongly perverted or depraved, the power of self-government is lost or greatly impaired and the individual is bound to be incapable . . . of conducting himself with decency and propriety in the business of life." Because he was small in stature, defendant felt inferior, inadequate and mistreated. He had difficulty getting along with other people and did not have normal social relationships. He was maladjusted, did not respect the rights of others and often behaved as if he was trying to "get back at the world." He could not keep a job and had attempted suicide once. He had also been to prison for stealing and was homosexually assaulted and harassed there. Defendant had many sexual problems, which included aggressive fantasies, peeping and cross-dressing (impersonating a female), and he was "extremely sensitive" to rejection by women. Both psychiatrists stated that, in their opinions, defendant was under the influence of an emotional disturbance at the time of the murder and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was also impaired.

Other relevant facts shall be related in the opinion.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Donald W. Stephens, for the State.*

*Dwight L. Cranford for the defendant-appellant.*

COPELAND, Justice.

Defendant contends that various errors require either a new trial upon all of the charges or a new sentencing hearing. We disagree and affirm defendant's convictions and the sentences of death and imprisonment imposed upon him for the brutal murder, rape and robbery of Whelette Collins.

GUILT PHASE: I-IV

I.

[1] Prior to trial, defendant filed written motions requesting individual voir dire and sequestration of the jurors during voir dire

and sequestration of the jury and the State's witnesses during the trial pursuant to G.S. 15A-1214(j), --- 1225, --- 1236(b). Judge Fountain denied these motions on the day of trial. In his brief, defendant concedes that these matters were addressed to the sound discretion of the presiding judge and that this record fails to disclose prejudicial error or an abuse of discretion in the judge's rulings.[2] We agree. *See, e.g., State v. Moore,* 301 N.C. 262, 271 S.E. 2d 242 (1980); *State v. Johnson* (I), 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980).

Defendant nonetheless complains that the judge should have permitted oral argument by counsel before he ruled upon the motions. This complaint is neither well-founded nor timely. There is nothing in the record which suggests that Judge Fountain, either by word or deed, intended to prevent defense counsel from speaking in support of the written motions. To the contrary, the record generally shows that counsel did not have anything to say beyond that which was already fully stated in the motions themselves and elected not to utilize his opportunity to be heard.[3] If, however, as defendant now contends, vigorous oral argument upon these matters was truly desired, it would have been quite simple and most prudent to have informed the trial court of it by means of an express request to be heard. Defendant, however, stood silently by and did not object to the manner in which the court conducted its proceedings upon the discretionary motions. In these circumstances, defendant has waived whatever objection he may have had, and his belated complaint may not be "heard" on appeal. In any event, we seriously doubt that a mere refusal by the trial court to receive supportive oral argument would, in and of itself, demonstrate substantive, reversible error in the

2. Defendant does not challenge the jury which was subsequently empanelled to try him or contend that there was collusion among the witnesses who testified against him.

3. Indeed, defendant has not apprised this Court of what else could have or would have been said in furtherance of the motions if the necessary opportunity, which he alleges was denied by the trial court, had instead been affirmatively provided to him and his counsel.

denials of discretionary motions under G.S. 15A-1214, --- 1225, --- 1236.[4] The assignment of error is overruled.

## II.

[2]   Defendant was indicted for armed robbery. Upon his motion, however, the trial court reduced this charge to common law robbery at the conclusion of the State's evidence. Defendant assigns error to the trial court's subsequent failure to set aside the jury's verdict of guilty of the lesser offense upon the ground that the State's evidence was also insufficient to show his commission of that crime.

Common law robbery is the felonious, non-consensual taking of money or personal property from the person or presence of another by means of violence or fear. *State v. Moore*, 279 N.C. 455, 183 S.E. 2d 546 (1971); *State v. Lawrence*, 262 N.C. 162, 136 S.E. 2d 595 (1964). Defendant maintains that, although there was evidence to support an inference that he unlawfully took $7.00 and a ring belonging to Whelette Collins, there was absolutely no evidence to support a conclusion that he stole these items from her while she was alive through the use of force or fear. The record plainly refutes this contention.

All of the State's evidence, both direct and circumstantial, must be viewed in the light most favorable to the State with every reasonable intendment being made in its favor. *See State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981); *State v. Agnew*, 294 N.C. 382, 241 S.E. 2d 684, *cert. denied*, 439 U.S. 830, 99 S.Ct. 107, 58 L.Ed. 2d 124 (1978). The pertinent evidence in this respect has been set forth in the lengthy recital of the evidence at the beginning of this opinion, and easy reference can be made thereto. It suffices to say here that the State's evidence was certainly substantial enough to convince a rational trier of fact that defendant, who had gone to the college intending to steal money from students, took money from Whelette Collins as he threatened her with what appeared to be a deadly weapon, soon after he kidnapped her and her two companions, at the nearby spot where he

---

4. We note that, although fundamental fairness would seem to require it, at least when a proper and timely request therefor is made, none of these statutes specifically mandates the receipt and consideration of oral arguments prior to the entry of final rulings by the trial court.

transferred the girls to his own car. This was long before he final-
ly raped and killed her at the distant, deserted rock quarry. That
being so, the instant case is clearly distinguishable from *State v.
Powell*, 299 N.C. 95, 102, 261 S.E. 2d 114, 119 (1980), where our
Court held that a charge of armed robbery should have been
dismissed because the evidence only indicated that the defendant
had committed larceny by taking certain objects "as an after-
thought once the victim had died." In contrast, the evidence
before us now tends to show that defendant robbed the victim of
what little money she had while she was with her companions and
still very much alive and afraid. Consequently, we uphold defend-
ant's conviction of common law robbery.

## III.

**[3]** Defendant argues that the trial judge did not fully state his
"numerous" contentions concerning the charges against him and
unfairly gave greater stress to the contentions of the State in his
final instructions to the jury. The argument is without merit.

To start with, defendant waived any objection to the manner
or length of the judge's statements of the contentions of either
side by failing to make an appropriate challenge at trial before
the jury retired. *State v. Virgil*, 276 N.C. 217, 172 S.E. 2d 28
(1970); *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469 (1968).
However, even if defendant had properly preserved such an ex-
ception for our review, we would not find prejudicial error upon
this record.

This is not a case in which the trial court utterly failed to
state *any* of the defendant's contentions after reciting those of
the State. *See, e.g., State v. Hewett*, 295 N.C. 640, 247 S.E. 2d 886
(1978). Rather, Judge Fountain generally referred to defendant's
contentions throughout his charge to the jury, as follows:

> He contends . . . from the evidence offered, that you should
> not be satisfied from that evidence and beyond a reasonable
> doubt that he is guilty of anything or that, if you find him
> guilty of anything, that you should find him guilty of only the
> least aggravating offense with which he is charged. But, ac-
> tually, he contends, members of the jury, by his plea of not
> guilty, that he is innocent; that the State has failed to prove
> his guilt and that, under all the circumstances, you should ac-
> quit him of all charges.

. . . .

. . . Of course, the defendant contends that you should have a reasonable doubt that he killed her. He contends that you should acquit him of the charge of murder in the first degree.

. . . .

. . . If he did not take any money from her, he could not be guilty of common-law robbery. . . .

As to that, the defendant contends that there is no evidence sufficient to justify you finding that he took any money from her or that, if he did, it resulted from violence or putting her in fear. . . . He contends that it didn't happen and that he did not put her in fear. Record at 63, 66 and 68.

It is true that defendant's contentions, as stated by the trial court, *supra*, seem sparse or brief in comparison to those presented in the State's behalf. However, the requirement that equal stress must be given to the contentions of both sides does not mean that the respective statements thereof must also be of corresponding lengths, consuming similar amounts of time. *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978); *State v. King*, 256 N.C. 236, 123 S.E. 2d 486 (1962); *State v. Sparrow*, 244 N.C. 81, 92 S.E. 2d 448 (1956). In the case at bar, defendant did not offer independent evidence at the guilt phase, he only elicited minor evidence upon cross-examination which tended to detract from, and not substantively negate, the weight of the State's circumstantial evidence, and he did not specifically request further elaboration by the trial court upon any point of contention in the case. Under these circumstances, the record as a whole convinces us that Judge Fountain adequately and fairly *summarized* defendant's essential contentions. *See State v. Spicer*, 299 N.C. 309, 261 S.E. 2d 893 (1980); *see also State v. Moore*, 301 N.C. 262, 271 S.E. 2d 242 (1980).

IV.

[4] In the course of its instructions upon the premeditation and deliberation elements of first degree murder, the trial court told the jury that there was no evidence of "any just cause or legal provocation to kill" in the case. Defendant believes that the trial

court thereby violated G.S. 15A-1222 which prohibits the expres-, sion of an opinion upon any question of fact to be decided by the jury. We hold that the isolated comment was not erroneous or prejudicial.

First, we do not believe that Judge Fountain's reference to the *complete absence* of certain evidence constituted an impermissible opinion upon a controverted fact. Rather, the contested statement was merely a legal recognition, correctly made upon the record, that the State's evidence had not disclosed the presence of just cause or adequate provocation to excuse the killing and that the defendant had not fulfilled his burden of going forward with or producing any such evidence either. *Cf. State v. Boone*, 299 N.C. 681, 263 S.E. 2d 758 (1980); *State v. Tate*, 294 N.C. 189, 239 S.E. 2d 821 (1978); *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed. 2d 307 (1976). Two analogous decisions of this Court are instructive and implicitly supportive of the conclusion we reach here: *State v. Byrd*, 121 N.C. 684, 28 S.E. 353 (1897), and *State v. Capps*, 134 N.C. 622, 46 S.E. 730 (1904). In *Byrd*, the Court held that in the absence of "any evidence, even a scintilla, tending to show self-defense. . . . it was proper for the court to instruct the jury that there was no such evidence." 121 N.C. at 685, 28 S.E. at 353. In *Capps*, the Court also stated that "whether there is any evidence . . . to rebut the implied malice [in a killing] is a question of law." 134 N.C. at 628, 46 S.E. at 732. In a similar vein, we are also persuaded that it is not error for the trial court simply to inform the jury as to whether or not *specific* evidence relevant to justification or mitigation has been *introduced* in a homicide prosecution. This is determined as a matter of law, not of fact. Such an instruction does not therefore invade or interfere with the exclusive province of the jury to decide and weigh the facts *presented*, and, in reality, it amounts to little more than a "summary" of the pertinent evidence upon a particular aspect of the case.

Secondly, there is no indication that Judge Fountain's statement wrongfully or absolutely withdrew from the jury's consideration any circumstances which might have tended to negate premeditation, deliberation or malice in the charged killing, or that it improperly removed from the State the burden of proving the existence of those elements beyond a reasonable doubt. *See*

Record at 65-68. Simply put, there is no reason to believe that the jury was misled or confused by the trial court's remark; thus, we can perceive no ascertainable prejudice to defendant in any event.

PENALTY PHASE: V-VIII

V.

[5] At the sentencing hearing, two psychiatrists stated opinions that defendant suffered from the emotional disturbance of antisocial personality, and, as a result, his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired at the time of the murder. The trial court accordingly submitted to the jury, *inter alia*, the corresponding factors of G.S. 15A-2000(f)(2) and (6) in mitigation of defendant's crime. The jury subsequently found that defendant had committed the murder under the influence of a mental or emotional disturbance, G.S. 15A-2000(f)(2); however, it did not find that defendant's capacity was also impaired at the time, G.S. 15A-2000(f)(6).

Defendant contends that the trial court erred by failing to give a requested peremptory instruction concerning the impairment of his capacity in light of the "uncontradicted" expert opinions, *supra*, and by not explaining more fully or clearly the legal nature of that mitigating circumstance.[5]

Our analysis of defendant's contentions about the trial court's instructions regarding the mitigating circumstance of G.S. 15A-2000(f)(6) is governed by the standards set forth in our previous decision in *State v. Johnson* (I), 298 N.C. 47, 257 S.E. 2d 597 (1979). In *Johnson (I)*, the Court held that, although the defendant has the burden of proving the existence of a mitigating circumstance, upon a proper request "[w]here . . . all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance," but that such "[a] peremptory instruction is inappropriate when there is conflicting

5. At the outset, we note that the trial court also denied defendant's request for a peremptory instruction upon the mitigating circumstance of a mental or emotional disturbance. However, defendant did not assign error to this denial since it obviously did not "impair" the jury's ability to make a finding favorable to him upon the issue.

evidence on [that] issue." 298 N.C. at 76-77, 257 S.E. 2d at 618. The trial court did not err in failing to give a peremptory instruction about the defendant's impairment under G.S. 15A-2000(f)(6) in *Johnson (I)* because there was lay testimony in the case which supported a finding contrary to that advanced by an expert who testified in defendant's behalf upon the issue. However, this Court was compelled to order a new sentencing hearing in *Johnson (I)* upon another ground: the trial court's inadequate treatment of the impairment issue in its substantive instructions to the jury. On this point, Justice Exum, speaking for the Court, said the following:

> The trial court should have explained the difference between defendant's capacity to know right from wrong which defendant conceded he possessed, and the *impairment* of his capacity to appreciate the criminality of his conduct from which his evidence indicated and he contends he suffered. While defendant might have known that his conduct was wrong, he might not have been able to appreciate, *i.e.*, to fully comprehend, or be fully sensible, of its wrongfulness. Further while his capacity to so appreciate the wrongfulness of his conduct might not have been totally obliterated, it might have been impaired, *i.e.*, lessened or diminished. The trial court should also have more carefully explained that even if there was no impairment of defendant's capacity to appreciate the criminality of his conduct, the jury should nevertheless find the existence of this mitigating factor if it believed that defendant's capacity to conform his conduct to the law, *i.e.*, his capacity to refrain from illegal conduct, was impaired. Again, this does not mean that defendant must wholly lack all capacity to conform. It means only that such capacity as he might otherwise have had in the absence of his mental defect is lessened or diminished because of the defect.

298 N.C. at 69-70, 257 S.E. 2d at 614; *see also State v. Johnson* (II), 298 N.C. 355, 373-75, 259 S.E. 2d 752, 763-65 (1979). Applying these principles to the case at bar, we hold that Judge Fountain's instructions upon G.S. 15A-2000(f)(6) were consistent with the evidence and sufficient under the law.

Ample evidence was introduced at the guilt phase of the trial which authorized a reasonable inference and conclusion by the

jury that defendant had the capacity to appreciate the character of his conduct and the ability to conform it to legal requirements when he murdered Whelette Collins, despite the contrary opinions of the psychiatrists. For example, the testimony of Dawn Killen and Yolanda Woods, the surviving girls who were restrained by the defendant for over nine hours on the night in question, generally tended to show that, from the very beginning to its tragic end, defendant executed a deliberate and carefully thought-out plan to fulfill certain criminal intents and satisfy his perverted lust, that he quickly recognized and adjusted to any new obstacles or barriers to his desired goals as such appeared, and that he was constantly aware of the legal implications of his various actions. In particular, these girls testified that, at several critical junctures in the evening's events, defendant calmly contemplated what he should do next and took special precautions against the possibility of being apprehended by the police, including the removal of his fingerprints from the victim's car, the transport of the girls to a secluded spot, and the evaluation of whether they had been able to see enough in the dark to identify him or his car. Record at 10, 11, 13 and 37. The additional facts demonstrated by the State concerning defendant's callous remark to the victim, after the rape, that he could put her out of her misery and his later attempt to conceal her body by "anchoring" it with a cinder block in the pond also conflicted with the psychiatrists' *after-the-fact* opinions that defendant was legally unaware of and lacked control over his actions as he effected a sordid scheme culminating in murder. We shall not belabor this further. In sum, there was plenary other evidence in the record which sufficiently, if not equally, suggested that defendant was in complete control of his faculties when he committed the capital crime, comparing it against the expert evidence showing the presence of a legal impairment, and it was the jury's duty to decide what to believe. As *all* of the evidence did not therefore support the existence of the mitigating circumstance of G.S. 15A-2000(f)(6), the trial court correctly refused to give defendant's requested peremptory instruction upon it. *State v. Johnson* (I), *supra.*

Judge Fountain also competently explained the difference between legal insanity totally excusing a crime and legal impairment merely mitigating the punishment for a crime and properly

emphasized that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law only had to be "lessened or reduced" in order for this mitigating circumstance to exist. The able judge additionally reminded the jury that defendant was relying upon "the evidence of the doctors" and "his history of psychiatric problems" to establish his diminished or impaired capacity at the time of the murder. Record at 93-94. As a whole, these instructions complied fully with the essential dictates of *Johnson (I) and (II)*, *supra*, as to the required extent and substance of a charge upon G.S. 15A-2000(f)(6). *See also* N.C.P.I.—Crim. § 150.10, at 30-33 (1980).

## VI.

[6] The form of the sentencing issues submitted to the jury and their answers thereto were as follows:

ISSUE NO. ONE:

Do you unanimously find from the evidence beyond a reasonable doubt that one or more of the following aggravating circumstances existed at the time of the commission of the murder?

ANSWER: Yes.

1. Was the murder committed while the defendant was engaged in the commission of or attempt to commit rape of the deceased?

ANSWER: Yes.

2. Was the murder committed while the defendant was engaged in the commission of or attempt to commit robbery of the deceased?

ANSWER: Yes.

3. Was the murder committed while the defendant was engaged in the commission of or attempt to commit kidnapping of the deceased?

ANSWER: Yes.

4. Was the murder especially heinous, atrocious or cruel?

ANSWER: Yes.

ISSUE NO. TWO:

Do you find that one or more of the following mitigating circumstances exist?

1. The murder was committed while the defendant was under the influence of mental or emotional disturbance.

ANSWER: Yes.

2. At the time of the murder, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

ANSWER: No.

3. The age of the defendant at the time of the crime.

ANSWER: No.

4. That the defendant has no significant history of prior criminal activity.

ANSWER: No.

5. Are there any other circumstances arising from the evidence which you, the jury, deem to have mitigating value?

ANSWER: No.

ISSUE NO. THREE:

Do you unanimously find from the evidence beyond a reasonable doubt that the aggravating circumstances are sufficient to outweigh the mitigating circumstances?

ANSWER: Yes.

ISSUE NO. FOUR:

Do you unanimously find from the evidence beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the imposition of the death penalty?

ANSWER: Yes.

Record at 100-01.

The trial court twice instructed the jury that it should proceed to issue four only after answering issues one and three affirmatively and, then if it also answered that final issue affirmatively, that it would have the "duty" to return a verdict of death against the defendant. Record at 96-99. Defendant argues that the trial court thereby erroneously impeded "a truly individualized assessment of the propriety of the death penalty" by the jury in contravention of the provisions of G.S. 15A-2000.

We upheld an identical instruction in *State v. Pinch*, also decided this date. We held there that the trial court had correctly advised the jury "that it had a duty to recommend a sentence of death if it made the three findings necessary to support such a sentence under G.S. 15A-2000(c)." [Issues one, three and four, *supra*, correspond to these necessary statutory findings.] Among other things, the Court reasoned that:

> The jury had no such option to exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it made pursuant to G.S. 15A-2000(c). The jury may not arbitrarily or capriciously *impose or reject* a sentence of death. Instead, the jury may only exercise guided discretion *in making the underlying findings* required for a recommendation of the death penalty within the "carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused."

306 N.C. 1, ---, 292 S.E. 2d 203, 227 (1982) (citations omitted). We believe that this reasoning applies with even greater force in the instant case since Judge Fountain carefully explained to the jury that it should exercise its full and considered discretion *in deciding issue four, supra:*

> That is for you to determine depending upon how you find from the case, from the issues you've answered. It is not something you would answer according to whim or caprice or guesswork, but you would weigh all the circumstances that you have found, if any, to be aggravating, those that you've found to be mitigating, and determine whether you find from the evidence and beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial; that is, sufficiently important to call for the im-

position of the death penalty. If the State has satisfied you from the evidence and beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the imposition of the death penalty, you would answer that, Yes; otherwise, you would answer it, No. Record at 96-97.

It was only after this clear direction, which comports with the procedure contemplated in G.S. 15A-2000(b), that Judge Fountain further told the jury that it had a duty to recommend capital punishment upon its affirmative answer to issue four.

We hold that *Pinch, supra,* constitutes sound and binding authority and is indistinguishable from the case at hand; consequently, we must overrule defendant's assignment of error. *Accord State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243 (1982); *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979); N.C.P.I. — Crim. § 150.10 (1980).

## VII.

[7] Defendant contends that the trial court should have instructed the jury that the court would impose a life sentence if the jury could not unanimously agree on a recommendation of punishment. This contention is meritless. Our Court has previously decided that it is improper for the jury to consider what may or may not happen in the event it cannot reach a unanimous sentencing verdict. *State v. Hutchins,* 303 N.C. 321, 353, 279 S.E. 2d 788, 807 (1981); *State v. Johnson* (II), 298 N.C. 355, 369-70, 259 S.E. 2d 752, 761-62 (1979). We shall take this opportunity, however, to state our agreement with the observation made by the Virginia Supreme Court, in a case cited to us in the State's brief, that such an instruction would be tantamount to "an open invitation for the jury to avoid its responsibility and to disagree." *Justus v. Commonwealth,* 220 Va. 971, 979, 266 S.E. 2d 87, 92 (1980); *accord Houston v. State,* 593 S.W. 2d 267, 278 (Tenn. 1980).

## VIII.

[8] Defendant finally makes a sweeping assertion, based upon all of his prior contentions, that the trial court should have set aside the jury's recommendation of death upon its own motion. Judge Fountain had no authority to do so after the jury had made the necessary findings to support imposition of the death penalty

under G.S. 15A-2000(c). Our Court has previously stated that the trial court does not have "the power to overturn a death sentence" and that the lower court is "obligated to enter judgments consistent with the jury's unanimous recommendation that defendant be sentenced to death." *State v. Hutchins*, 303 N.C. 321, 356, 279 S.E. 2d 788, 809 (1981); *State v. Johnson* (II), 298 N.C. 355, 371, 259 S.E. 2d 752, 762 (1979).

## IX.

Pursuant to the mandate of G.S. 15A-2000(d), this Court accords the greatest diligence and care in the review of a capital case. We have fully considered all of defendant's assignments of error in the record on appeal. We are convinced that defendant's trial and sentencing hearing upon the charged offenses were fairly conducted without the commission of prejudicial error.

The judgment of death was lawfully imposed. The evidence supported the submission of the aggravating circumstances of G.S. 15A-2000(e)(5), upon the separate theories of the rape, robbery and kidnapping of the deceased, and 15A-2000(e)(9), that the murder was especially heinous, atrocious or cruel. We find no indication in the record that the death penalty was recommended by the jury under the influence of passion or prejudice. Finally, we hold that the sentence of death for the intentional, deliberate and senseless murder of Whelette Collins was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See, e.g., State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981). Defendant's criminal acts were certainly as reprehensible as those committed by the defendants in *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. ---, --- S.Ct. ---, 72 L.Ed. 2d 155 (1982), and *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, 101 S.Ct. 1731, 63 L.Ed. 2d 220 (1981). The State's evidence revealed that the nineteen year old victim suffered agonizing and humiliating torture at the merciless hands of the defendant who kidnapped her, raped her, cruelly mocked her as she stood naked in the cold and finally beat her to death in a wanton, brutal manner using a cinder block. Mere words are insufficient vehicles to describe the tragic horror of what happened to this poor girl and not even

capital punishment can fully repay the price of her inexplicable and needless suffering.

We find no error in the guilt or penalty phases of defendant's trial.

No error.

Justice CARLTON did not participate in the consideration or decision of the case.

Justice EXUM dissenting as to sentence.

For the reasons stated in Part I of my dissent in *State v. Pinch*, 306 N.C. 1, 38, 292 S.E. 2d 203, 230 (1982), I disagree with the majority's conclusion in Part VI of its opinion. In my view it was prejudicial error for the trial judge to instruct the jury that it had a duty to recommend the death sentence if it answered certain issues favorably to the state. My vote, therefore, is to vacate the judgment imposing the death sentence and remand for a new sentencing hearing.

I concur in the majority's conclusion that there is no error in the guilt phase of the case.