STATE OF NORTH CAROLINA v. SONJA ALETHEA STEPHENSON

No. COA00-512

(Filed 3 July 2001)

**1. Robbery— armed—taking by violence or fear—sufficiency of evidence**

There was sufficient evidence to support an armed robbery conviction, which underlay a first-degree murder conviction, where defendant contended that there was no evidence that the taking was by violence or putting in fear because the taking was complete by the time the altercation occurred. Taking the evidence in the light most favorable to the State, defendant resorted to violence before she left the victim's home in order to retain the money she had taken from the victim's dresser, and the taking and violence were thus part of one continuing transaction.

**2. Evidence— other offense—drug use—not prejudicial**

There was no plain error in a prosecution for robbery and first-degree murder in the admission of evidence that defendant had bought and used illegal drugs where the evidence was properly used to demonstrate motive and there was no reasonable possibility of a different outcome if the jury had not known of the drug use. Defendant's version of events was incredible and would not have been more believable in the absence of this evidence.

**3. Evidence— hearsay—deceased victim—catchall exception**

The trial court did not err in a prosecution for robbery and first-degree murder by admitting hearsay testimony regarding statements made by the victim before her death that defendant had stolen $200 from her under the catchall exception of N.C.G.S. § 8C-1, Rule 804(b)(5) where the court made numerous findings to the effect that the victim and the witness were extremely close and that the witness was the only person in the community who looked after the victim, whom the victim trusted, and in whom she confided.

**4. Evidence— murder victim—irrelevant evidence about victim—not prejudicial**

The trial court did not err in a prosecution for robbery and first-degree murder by admitting evidence that the victim had not been able to receive her Christmas gift basket from church, a portrait photograph of the victim taken before she died, and twelve items of clothing where there was convincing evidence of

defendant's guilt and no reasonable possibility that the outcome was changed.

**5. Confessions and Incriminating Statements— Miranda warnings—lapse of time until questioning**

The trial court did not err in a prosecution for robbery and first-degree murder by denying defendant's motion to suppress her statements because she was not properly advised of her constitutional rights where, assuming that she was in custody and that Miranda warnings were required, warnings given at 6:30 p.m. were still in effect at the time of defendant's questioning 30 to 45 minutes later and at the time of her inculpatory oral statement one and a half hours later.

**6. Confessions and Incriminating Statements— promises and coercive environment—statement not induced**

Statements given by the defendant in a prosecution for first-degree murder and robbery were not induced by promises and a coercive environment where the officers were merely speaking in generalities and asking defendant to tell the truth, and there was evidence to support the finding that officers had made no promises of leniency.

**7. Confessions and Incriminating Statements— promises or threats—statements about defendant's child**

Statements by officers to a robbery and murder defendant regarding her child did not amount to promises or threats regarding defendant's child where the detective told her that he had seen defendant's closeness with her child and that the child deserved a better life.

**8. Confessions and Incriminating Statements— environment—not coercive**

A robbery and first-degree murder defendant was not questioned in a coercive environment where defendant was not physically or mentally impaired and showed a willingness to talk to the officers; she never asked for a lawyer, asked to go home, or requested to remain silent; she was never handcuffed, physically restrained or threatened, and the officers were in plain clothes; she was told that she was free to leave and that the interview was to be entirely voluntary; the officers did not accuse her of lying and did not yell at her or show anger; and defendant's requests to smoke and use the telephone were allowed.

STATE v. STEPHENSON

[144 N.C. App. 465 (2001)]

**9. Homicide— first-degree murder—short-form indictment—
no error**

The short-form murder indictment has been approved by the
North Carolina Supreme Court.

Appeal by defendant from judgment entered 30 April 1999 by
Judge Donald Jacobs in Northampton County Superior Court. Heard
in the Court of Appeals 18 April 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney
General Alexander McC. Peters, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant
Appellate Defender Daniel R. Pollitt, for the defendant.*

HUDSON, Judge.

Defendant appeals her conviction of common law burglary and
first degree murder. We find no reversible error in the proceedings
below.

The evidence presented at trial tended to show the following: in
the fall of 1996, the 30-year old defendant went regularly to the home
of 84-year old Mildred Carter (Carter). She knew where Carter kept
her money and when Carter's monthly checks arrived, and she told
her friend Sharon Turner that she was "getting" money from Carter.
She told Turner, "I ought to rob Ms. Mildred, hit that bitch in the
head."

Defendant indicated in a statement to police that, on 10
December 1996, she went to Carter's home to pay back some money
she owed her. Defendant asked to borrow more money, but Carter
said no. Defendant then went to use the phone in Carter's bedroom,
opened her dresser drawer when Carter wasn't looking, and removed
$10.00. Carter "caught" defendant taking the money and demanded it
back. She allegedly grabbed defendant's coat sleeve and pushed her,
and defendant pushed her back. Defendant maintained that Carter
then hit a closet door and grabbed some plastic bags as she fell to the
floor. The bags purportedly "caught on [Carter's] face" and she strug-
gled to remove them. Defendant claimed she began putting more bags
on Carter's face, and that Carter started wheezing. It appeared to
defendant that Carter had gotten part of a bag in her mouth, and
Carter asked defendant to help her, but defendant "was scared and
couldn't move." "I just watched her choke herself . . . from the bags
being over her face that she just couldn't get off alone." Defendant

opined that Carter essentially "killed herself from fighting herself with the plastic bags."

On 11 December, law enforcement officers discovered Carter's body lying at the front door inside her home. Carter had been dead for a number of hours, and her body was fully clothed and lying face up with a brown plastic grocery bag pressed tightly around her neck. Newspapers and five or six plastic grocery bags were in disarray around the immediate area of her body. There was no evidence of a struggle anywhere else in the home. The autopsy showed Carter had eight broken ribs and a depression in the skin around most of her neck. The cause of death was a combination of ligature strangulation (strangulation with a device pulled around the neck) and smothering.

Defendant was subsequently indicted for armed robbery and murder. The jury found her guilty of common law robbery and first degree murder under the theory of felony murder, with robbery as the underlying felony. The jury was unable to reach a unanimous verdict with regard to awarding defendant the death penalty. The trial court arrested judgment on the robbery conviction and sentenced defendant to life in prison without parole. Defendant appealed to this Court.

[1] Defendant first argues that her first degree murder conviction must be vacated, because there is insufficient evidence she committed common law robbery, the felony which underlies her first degree murder conviction. Common law robbery is defined as the non-consensual taking of money or personal property from another by means of violence or putting in fear. See State v. Smith, 305 N.C. 691, 700, 292 S.E.2d 264, 270, cert. denied, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). The violence or putting in fear must precede or be concomitant with the taking in order for the crime of robbery to be committed. See State v. Sumpter, 318 N.C. 102, 111, 347 S.E.2d 396, 401 (1986).

Defendant in this case contends there was no evidence any taking of property was done "by violence or putting in fear." She claims the taking of the money from Carter's dresser was complete by the time she and Carter had a physical altercation. A similar argument was made by the defendant in State v. Sumpter, who asserted the evidence showed he had broken into an unoccupied house and had already taken property when the victim unexpectedly came home and he shot her. The Supreme Court held: "[f]rom this evidence the jury

rationally could have found beyond reasonable doubt that defendant used violence before he left the victim's premises with the stolen property, and, therefore, before the taking was over." 318 N.C. at 112, 347 S.E.2d at 402. Thus, the taking and the violence were part of "one continuing transaction" and supported the charge of robbery. *Id.*

In the present case, the evidence taken in the light most favorable to the State showed that defendant resorted to violence before she left Carter's home in order to retain the money she had taken from Carter's dresser. *See State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 652 (1982) (in determining sufficiency of evidence to support verdict, evidence must be taken in light most favorable to the State). This evidence is sufficient to prove defendant took money from Carter by violence or putting her in fear, and therefore supports the charge of common law robbery.

[2] Defendant next contends the trial court erroneously admitted evidence that she had bought and used illegal drugs. State's witness Wendell Gatling (Gatling) testified without objection that, in early December 1996, defendant asked him for a ride to Norfolk, bought $60.00 worth of cocaine there, and smoked it. He further testified without objection that on 11 December 1996, the day after Carter died, defendant asked him for a ride to Norfolk to buy cocaine, bought and smoked cocaine on the way to Norfolk, unsuccessfully tried to buy more cocaine in Norfolk, and asked Gatling if he knew where to buy more cocaine. Over defendant's objection, Gatling read his prior statement to police containing this evidence to the jury, and the statement itself was admitted as evidence for corroborative purposes. Also over defendant's objection, Investigator Mason read a statement to the jury by defendant in which she admitted unsuccessfully trying to buy cocaine in Norfolk on December 11th. Finally, defendant complains that the State, with no objection by defendant, referred to defendant's buying and using cocaine a number of times during closing argument.

Defendant claims the above evidence was inadmissible under N.C. R. Evid. 401 because it was irrelevant in proving the crimes charged. Defendant also contends its admission violated N.C. R. Evid. 404(b), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Defendant argues that this evidence convinced the jury she was a person of bad character who must have committed the charged offenses.

Evidence of other wrongs, however, "may be admissible for other purposes, such as proof of motive." N.C. R. Evid. 404(b). In the present case, we believe evidence of defendant's drug use was properly used to demonstrate that she had a motive to rob Carter. *See State v. Powell*, 340 N.C. 674, 690, 459 S.E.2d 219, 226-27 (1995), *cert. denied*, 516 U.S. 1060, 133 L. Ed. 2d 688 (1996) (evidence of defendant's cocaine habit relevant to show motive to commit robbery after his government assistance checks were terminated); *State v. Stevenson*, 136 N.C. App. 235, 241, 523 S.E.2d 734, 737 (1999), *disc. review denied*, 351 N.C. 368, 543 S.E.2d 144 (2000) (evidence that defendant went to place known for drug dealing immediately after robbery relevant to show motive); *State v. Smith*, 96 N.C. App. 235, 240, 385 S.E.2d 349, 351 (1989), *disc. review denied*, 326 N.C. 267, 389 S.E.2d 119 (1990) (defendant's possession of cocaine tended to establish motive for robbery). In this case, the evidence of defendant's drug use was limited to two instances in December 1996, clearly within the time period she was "getting" money from Carter. The second day about which Gatling testified, December 11th, was the day after Carter was killed. Evidence of defendant's desire and attempt to buy drugs in December 1996 provides a potential explanation as to why she killed Carter in order to retain the $10 she had taken.

We note that defendant did not object to the majority of the instances in which the State introduced evidence of defendant's drug use. As such, defendant is limited to arguing that the trial court committed "plain error" in allowing such evidence. *See* N.C.R. App. P. 10(c)(4). "Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Gardner*, 315 N.C. 444, 450, 340 S.E.2d 701, 706 (1986) (citations omitted). As for the evidence to which defendant properly objected, in order to reverse the trial court, we must believe that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1999).

Assuming *arguendo* that the evidence of defendant's drug use was improperly admitted, we cannot say the trial court committed "plain error," or even prejudicial error under G.S. § 15A-1443. We do not believe there is a reasonable possibility the trial would have had a different outcome if the jury had not known of defendant's drug use. Defendant admitted that she took money from Carter, then

engaged in a physical altercation with Carter, put bags on her face, and watched her die. Her assertion that Carter killed herself fighting with the bags is incredible and would not have become more believable in the absence of this evidence. The autopsy showed Carter was killed in part by ligature strangulation, and this evidence created a strong inference that defendant strangled her to death with a grocery bag.

**[3]** Defendant next contends the trial court erroneously admitted testimony by Leroy Long (Long) regarding statements made by Carter before her death under N.C. R. Evid. 804(b)(5) without making proper findings. The State filed a pre-trial notice of intent to present Long's hearsay evidence at trial under Rule 804(b)(5), and the court held a hearing on the matter. At the hearing, Long testified that in the several weeks before her death Carter told him: 1) "[Defendant] took $200 from [me];" 2) "While [defendant] was making a telephone call, that's when she got that $200;" 3) "I know who got [my money] because [defendant is] the only one that's been here and been in there;" 4) "[Defendant has] got every nickel I've got in here and I don't have money to pay my bills;" and 5) "I ain't got no money because [defendant has] done been in here and got my money." In an oral order later reduced to writing, the trial court admitted this testimony into evidence over defendant's objection. Also over defendant's objection, the court instructed the jury it could consider Long's testimony to show that defendant had "a plan, scheme, system, or design involving the crime charged in this case."

Under Rule 804, if a witness is unavailable to testify at trial, for example, due to death, the witness's statement may be admitted under certain exceptions to the rule excluding hearsay. Under Rule 804(b)(5), a statement not covered under other specifically enumerated exceptions is admissible if it has

> equivalent circumstantial guarantees of trustworthiness [and] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Defendant argues the trial court failed to make findings of fact and conclusions of law that Long's testimony was "more probative on

the point for which it [was] offered than any other evidence which the proponent [could have] procure[d] through reasonable efforts." Defendant's argument is without merit.

The trial court made numerous findings of fact to the effect that Long and Carter were extremely close and that he was the only person in the community who looked after her, whom she trusted, and in whom she confided about financial and personal matters. Carter was clearly the person in the best position to know that defendant had stolen $200 from her, and the court's findings demonstrate that Long was the likeliest person with whom Carter would have shared this information.

The trial court made a conclusion of law that Long's hearsay testimony was "more probative than any other evidence which the State may present because the victim, Mildred Carter, is unavailable due to her death." Defendant is correct that Carter's unavailability due to her death is a prerequisite for admission of the evidence under Rule 804(b)(5), and is not an explanation of why Long's testimony was more probative on the point for which it was offered than any other evidence the State could reasonably find. However, the trial court's extensive findings of fact support its conclusion that Long's testimony did meet the requirements of Rule 804(b)(5)(B).

As for the trial court's instruction to the jury that it could use Long's testimony as proof that defendant had a plan or scheme to rob Carter, defendant simply argues that it was improper due to the inadmissibility of Long's statement under Rule 804(b)(5). Again, the trial court made proper findings as to the admissibility of Long's statement. This assignment of error is overruled.

[4] Next, defendant asserts the trial court erroneously admitted certain irrelevant evidence which had the effect of inflaming the passions of the jury to convict her. First, Mary Pittman testified that, on 11 December 1996, she attempted to deliver a Christmas gift basket to Carter's house but got no answer. Over defendant's objection, Pittman testified that the basket was from Carter's church and affirmed that Carter was never able to get her "little goodie Christmas basket" because she was dead.

Second, Pittman, Leroy Long, and Sharon Turner testified that a portrait photograph of Carter taken before she died looked like Carter in life; over defendant's objection, the trial court admitted the picture into evidence. This picture was later passed to the jury.

Third, over defendant's objection, Detective Barfield identified and the court admitted into evidence twelve items of clothing he retrieved at Carter's autopsy and from her home, including the gown, shorts, shoes, underpants, panties, bra, slip, stockings, girdle, hat, and wig she appeared to have been wearing at the time she was killed, and a loose button found under her body. The jury was at one point allowed to view and touch the clothing while wearing gloves.

N.C. R. Evid. 401 states: " 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The photograph of Carter was relevant in that it allowed the State to contrast Carter's normal, well-kept appearance with her appearance when she was found dead in her home. This contrast was evidence that there was a struggle before she died. Furthermore, certain items of Carter's clothing had dirt and blood on them and thus were relevant as evidence of a struggle and of her injuries.

We agree that Pittman's statement regarding Carter's inability to get her Christmas basket was irrelevant to the case, as were arguably certain items of Carter's clothing which were not stained, such as her underclothing. However, we believe there is no reasonable possibility that admission of Pittman's statement and Carter's clothing changed the outcome of this case. See G.S. § 15A-1443(a). As discussed above, defendant's explanation of Carter's death defies credibility; there was convincing evidence that defendant robbed and killed Carter. Any error by the trial court in admitting the above evidence was harmless. Furthermore, defendant did not object to the jury's personal viewing of Carter's picture and of her clothes, and we do not believe the trial court's allowing this contact with the evidence amounted to plain error.

[5] Defendant next argues that the trial court erred in denying her motion to suppress oral and written statements she gave to the police on 14 December 1996, in that she was not properly advised of her constitutional rights beforehand and that the statements were given involuntarily.

In its order on defendant's motion to suppress these statements, the trial court found the following facts: On 13 December 1996, officers spoke with defendant on three occasions. She gave statements on two of these occasions, which statements are not the subject of the motion to suppress.

On the afternoon of 14 December 1996, Detectives Barfield and Skinner interviewed Wendell Gatling, who gave a statement which conflicted with those of defendant. The officers telephoned Investigator Mason and asked that he seek defendant's further cooperation in coming to the sheriff's office for another interview. Mason went to defendant's house in plain clothes, asked if she would go to the sheriff's department to answer more questions, and, when she said yes, returned to his unmarked car to wait for her. Defendant sat in the front seat of the police car on the way to the station.

At the station, she was taken into an interview room and given the Miranda warnings at approximately 6:30 p.m. Defendant indicated she understood each of the constitutional rights read to her and signed a form waiving these rights. Mason did not ask her any questions, but explained that the interview would not begin until Barfield and Skinner arrived in a few minutes. Defendant indicated her willingness to wait for their arrival and thereafter sat in the interview room unattended. Approximately 30 to 45 minutes later, Barfield and Skinner arrived. Barfield and Mason conferred outside the interview room in close proximity to defendant, where Mason advised Barfield he had warned defendant of her rights and that she had waived them. Barfield entered the room and advised her that he wanted to talk with her further, but that she was not under arrest and that she was free to leave. Barfield and Skinner, also present, were unarmed, in plain clothes, and without handcuffs or symbols of authority.

After some discussion with the officers, defendant requested to smoke and use the telephone, both of which were allowed. She went across the hall to use the telephone unattended. She talked for approximately three to five minutes to her mother, then returned to the room and said, "I'll tell you what happened." She gave an inculpatory verbal statement, and when she was finished, the officers asked her to write it down. She was then advised of her Miranda rights, waived them, and wrote the same statement she had orally given. Finally, she was arrested and booked.

The trial court's findings of fact resulting from the *voir dire* on defendant's motion to suppress are binding if they are supported by any competent evidence in the record. *See State v. Leak*, 90 N.C. App. 351, 354, 368 S.E.2d 430, 432 (1988). We have thoroughly reviewed the record and determined the court's findings of fact above are so supported.

Defendant first contends that her oral statement to police on 14 December 1996 is inadmissible because she was in custody at the time of the statement and was not warned of her constitutional rights before she gave it. *See State v. Harvey*, 78 N.C. App. 235, 237, 336 S.E.2d 857, 859 (1985) (person "in custody" of police must be informed of rights before interrogation begins). The trial court found that defendant was informed of her rights at 6:30 p.m. and was questioned by police approximately 30 or 45 minutes later. Defendant contends that the 6:30 p.m. Miranda warnings had grown stale by the time she was questioned by police and gave an inculpatory statement at approximately 8:00 p.m.

Whether the Miranda warnings were stale such that "there is a substantial possibility [defendant] was unaware of [her] constitutional rights at the time of the subsequent interrogation" is to be determined by the totality of the circumstances. *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201, 212 (1975), *vacated in part*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). Our Supreme Court has set forth several factors to consider in determining whether earlier Miranda warnings remained in effect during subsequent questioning:

> (1) the length of time between the giving of the first warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statement differed from any previous statements; (5) the apparent intellectual and emotional state of the suspect.

*Id.* (citations omitted).

Assuming *arguendo* that defendant was in police custody on December 14th and that therefore Miranda warnings were required, an analysis of the above factors leads us to a determination that the 6:30 p.m. warnings were still in effect at the time of defendant's questioning 30 to 45 minutes later and at the time of her inculpatory oral statement one and a half hours later. First, based on prior case law, we do not believe an overly long amount of time passed between the giving of the Miranda warnings in this case and defendant's questioning and statement. *See State v. Mitchell*, 353 N.C. 309, 328, 543 S.E.2d 830, 842 (2001) (admitting a confession which occurred six and a half hours after warnings); *State v. Westmoreland*, 314 N.C. 442, 447, 334 S.E.2d 223, 226 (1985) (second interrogation within two and a half

hours of initial warnings; warning not stale); *State v. Small*, 293 N.C. 646, 655, 239 S.E.2d 429, 436 (1977) (thirty minute lapse of time between initial questioning and subsequent interrogation did not render warnings stale).

Furthermore, defendant was given the Miranda warnings and interrogated in the same room. Although Officer Mason gave defendant the warnings and Officers Barfield and Skinner questioned her, Mason explicitly told defendant that the other officers, not he, were going to question her. She expressed a willingness to wait for their arrival and was thereafter left alone in the room to wait for them. There were no intervening events between the warning and their arrival to dilute the message of the Miranda warnings. However, defendant's December 14th statement did differ from her earlier statements and did inculpate her. This factor weighs against finding the Miranda warnings to be valid.

Regarding defendant's intellectual and emotional state, the court found as fact that she was a thirty year-old woman with a twelfth grade education. She was not under the influence of drugs or alcohol at the time of her statement; rather, she was alert and coherent and her attitude toward the officers was generally calm.

Balancing the above factors, we agree with the finding of the trial court that the 6:30 p.m. Miranda warnings were not so remote in time as to be stale at the point of defendant's questioning and statement shortly thereafter. In other words, we do not believe there is a substantial possibility that defendant was unaware of her constitutional rights at the time she gave her December 14th oral statement. As for defendant's written statement, given immediately after the oral statement, defendant was advised of her constitutional rights before making it.

[6] Regardless of her awareness of her Miranda rights, defendant contends that her statements were induced by promises made by the officers and an overall coercive environment. In determining whether a statement was given voluntarily, the court is to consider the totality of the circumstances. *See State v. Smith*, 328 N.C. 99, 114, 400 S.E.2d 712, 720 (1991).

Defendant first points to several statements made by Detectives Barfield and Skinner during her questioning on December 14th as being coercive. Specifically, Barfield told her that in his experience, "a lie would hurt her much more than the truth ever would."

He also said that if she had to go to court, she "could tell the court about her drug problem, or anything else she wanted to tell." Detective Skinner told her that "a mistake had been made and it was time to correct it."

A confession is not admissible when it is induced by "threat, coercion, hope, or promise of reward." *State v. Small*, 293 N.C. 646, 652, 239 S.E.2d 429, 434 (1977). However, it is not coercive for officers to ask an accused to tell the truth if they hold out no hope of a lighter punishment in exchange for the accused's inculpatory statement. *See State v. Fox*, 274 N.C. 277, 292, 163 S.E.2d 492, 503 (1968). In *Small*, the Supreme Court held that an officer's telling a defendant that he could not "buy" one of the defendant's statements and that the defendant should tell the truth did not amount to coercion. 293 N.C. at 653, 239 S.E.2d at 435. Likewise, in *State v. Dishman*, 249 N.C. 759, 762, 107 S.E.2d 750, 752 (1959), the Supreme Court did not object to an officer's message that "[he] thought it would be better if [the defendant] would go ahead and tell [them] what had happened."

In this case, the officers were merely speaking in generalities and asking defendant to tell the truth. The trial court found as fact that the officers made no promises of leniency in exchange for her giving a statement, and there is evidence in the record to support this finding.

Detective Barfield's statement that she could tell the court about her drug habit does imply that drug use is a relevant factor the court might consider in her favor in determining her culpability. However, the officers did not promise defendant that the judge would show her leniency on this basis. In fact, the trial court did submit defendant's cocaine use as a mitigating factor in her sentencing phase, and it was the only mitigating factor the jury found to apply.

[7] Defendant also objects to certain statements the officers made about her child. When Detective Skinner visited her home on the night of December 13th, he told her that her son was well-behaved. On December 14th, during defendant's questioning, he told her he "saw the closeness that she had with her child the night before." Also on the 14th, Detective Barfield told defendant her child deserved a better life than he was having at that time. Defendant contends the officers effectively told her that her son's life would be better if she cooperated and gave a statement. We do not believe these statements by the officers amounted to promises or threats regarding defendant's child.

STATE v. STEPHENSON

[144 N.C. App. 465 (2001)]

**[8]** Defendant argues finally that there was an overall coercive environment. The trial court did not find this to be the case. Defendant was not physically or mentally impaired, and she showed a willingness to talk to the officers. She never asked for a lawyer, asked to go home, or requested to remain silent. Defendant was never handcuffed, physically restrained or threatened, and the officers were in plain clothes. Detective Barfield told her she was free to leave and that the interview was to be entirely voluntary on her part. The officers did not accuse her of lying, and did not yell at her or show anger. Defendant requested to smoke and to use the telephone, both of which were allowed. These findings are supported by evidence in the record. In considering the totality of the circumstances, defendant was not questioned in a coercive environment and her statements will not be considered involuntary.

**[9]** Defendant finally argues that her first degree murder conviction must be vacated because the "short-form" indictment returned by the grand jury did not allege that the murder was committed during the perpetration of another felony. Defendant recognizes that the North Carolina Supreme Court approved the use of such "short-form" indictments in *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). We are not at liberty to revisit this issue. *See Dunn v. Pate*, 106 N.C. App. 56, 60, 415 S.E.2d 102, 104 (1992), *rev'd on other grounds*, 334 N.C. 115, 431 S.E.2d 178 (1993) (Court of Appeals bound by decisions of the Supreme Court).

No error.

Judges WYNN and TIMMONS-GOODSON concur.